## Court of Appeals.

April 17, 1900.

## PEOPLE vs. JAMES O. SMITH.

(162 N. Y. 520.)

1. ARSON—EVIDENCE.

On a trial for arson the theory of the People was that four members .of a family entered into a conspiracy to burn a house and store and defraud the insurance companies afterward. *Held,* that there was some evidence to support the finding that the fire was of incendiary origin, and tending to show that the defendant, though absent at the origin of the fire aided and abetted, counselled and induced, his father to commit the act.

3. SAME.

Where a witness testifies to the removal of personal property before the fire by the persons charged with the arson, and subsequently included by them in their proofs of loss, it is not competent for the officer to whom the witness pointed them out, to testify that she identified the articles or pointed them out to him, as the same mentioned in the proofs of loss.

3. SAME.

It is improper for the court in overruling defendant's objection to testimony, to refer to the existence of a conspiracy based upon the evidence alleged by the court to have been received by the court in another case, when defendant's father had been convicted.

4. SAME.

Another witness was allowed, over an objection, to testify among other things that the persons charged had promised to pay him but never had done so. *Held,* error.

VOL. XV—1

5. SAME—CHARGE TO JURY.

The defendant requested the court to charge "That before the jury can convict this defendant the evidence must be so strong as to remove every other hypothesis than that of the defendant's guilt," which the court declined to do, but charged that "it must be sufficient to remove every reasonable hypothesis." *Held,* that his refusal to charge, followed by such a qualification, was confusing to the minds of the jury.

6. SAME—IMPROPER STATEMENT BY DISTRICT ATTORNEY.

Where the district attorney stated that "before the fire in which several buildings owned by the mother and family of defendant were burned, many other buildings which the defendant had assisted in erecting or in which he was interested, were destroyed in a similar manner," and as he was proceeding to say, "Within less than a year before the fire on the boulevard," the counsel objected and was overruled when the district attorney remarked that if counsel insisted upon it, he "would not go into the matter—at this time," it constituted mere·irrelevant statement, prejudicial to defendant's rights.

APPEAL from a judgment of the Appellate Division of the Supreme Court in the fourth judicial department, entered February 11, 1899, affirming a judgment of the Monroe County Court convicting ·the defendant of the crime of arson in the first degree, and an order denying a motion for a new trial.

The defendant was jointly indicted with his father, James Smith. The indictment contained two counts. The first count charged arson in the first degree, in that the defendant and James Smith did on the 6th day of December, 1894, in the town of Greece, Monroe county, unlawfully set on fire and burn in the night time the building and hotel commonly known as the Half Way House of Frances M. Smith, the same being a dwelling house where at the time there was no human being, and six other buildings of the said Frances M. Smith, the first adjoining the Half Way House and the second adjoining the first, and the third the second, and so on, also four other adjoining buildings belonging to other persons. Only one act of arson was charged. The second count charged arson in the third degree by charging the defendant and James Smith with unlawfully and feloniously. setting on fire and burning the same buildings of Frances M. Smith at the place and on the date above named, except the charge that it was in the night

time was omitted, and the charge added that the buildings were insured, the intent being to prejudice the insurers thereof.

P. Chamberlain, for appellant.

S. J. Warren, for respondent.

LANDON, J. 1. In view of the lack of unanimity in the affirmance by the Appellate Division of the judgment of conviction, we have examined the record to ascertain as a question of law whether there is evidence tending to support the verdict. The single question in this part of our investigation is whether there is evidence tending to support the finding that the fire was of incendiary origin.

The fire broke out about two o'clock in the morning of December 6, 1894, in the Half Way House, a building belonging to Mrs. Frances M. Smith, situate on the Boulevard in the town of Greece, Monroe county. The building was occupied by James Smith, the father of the defendant, as a hotel, but at the time of the fire the business done in the building was very slight, and had practically ceased. The defendant spent the night of the fire at the house of his sister, Emma Smith, on Meigs street in the city of Rochester, about three miles away from the Half Way House. James Smith and his servant, Thomas Bidwell, and a carpenter named La Flamme in his employ, sat around a small stove in the bar-room during the evening before the fire, and until about midnight, when they together left the building, and all of them went to the Electric Cottage, so called, directly across the street, where the senior Smith and his wife, Frances M. Smith, the mother of the defendant, resided. Two hours later the senior Smith gave the alarm of fire. He was then in the street, clothed in his usual manner. The fire appeared to be in a bedroom in the second story. There is no direct evidence of any combustible materials there, or showing how the fire originated. The jury seem, in view of the circumstances, to have inferred that the senior

Smith went in there and kindled it, and then gave the alarm. The fire extended and consumed eleven buildings. Seven of these buildings belonged to Mrs. Smith, the mother of the defendant. They were insured in various companies. There is evidence that the buildings, or some of them, were constructed by the defendant and his father of cheap materials, and by low-priced labor, and that the insurance companies settled the losses for less than the face of the policies, but no other evidence that they were insured for more than their value. The contents of the Half Way House and the store adjoining were also insured. Evidence was given tending to show that shortly before the fire the defendant, his father and mother removed from these buildings most of their contents, and that after the fire they with their sister co-operated in making proofs of loss in the name of defendant's mother in which these removed articles, and some others that were never in the buildings, were inserted as destroyed. There was also evidence to the effect that the defendant and his father in conversing with each other made some remarks susceptible of a construction that a fire would occur, and after the fire that the defendant made some remarks indicating a desire to suppress information about the fire. The theory of the People was that the defendant, his father, mother and sister Emma, before the fire, entered into a conspiracy to burn the Half Way House and store and defraud the insurance companies afterwards, and that the Half Way House was set on fire in pursuance of this conspiracy. Of course, the fire might have been accidental, or the work of some unknown incendiary, and the conspiracy to defraud the insurance companies, if such there was, have been formed after the fire. But we cannot say that there was no evidence tending to support the finding that the fire was of incendiary origin. The evidence also tends to show that the defendant, although absent at its origin, aided and abetted, counseled and induced his father to commit the act, and thus to convict the defendant as a principal. Penal Code, section 29. The competency of some of this evidence is challenged.

2. A Miss La Violette was the principal witness on the part of the People to prove the incriminating remarks of the defendant and his father, the removal by the defendant, his father and mother of the personal property from the Half Way House before the fire, their co-operation with each other and his sister in making the proofs of loss after the fire, and the inclusion in the proofs of loss of the removed articles and others not destroyed. Her history of herself and of her relations with the Smiths tended to impair her credibility.

The People placed the proofs of loss of the personal property in the Half Way House and store in evidence and then called Miss La Violette. She testified that some of the articles mentioned therein were removed from the house before the fire and taken to the house of Emma Smith in Meigs street, Rochester, and others to the Electric Cottage, a house occupied by the Smiths on the opposite side of the street from the Half Way House, and she specified the articles. In doing this she responded mainly to questions asked by the district attorney as he read from the proofs of loss, one article after another named therein. She then testified that some time after the fire she went with Officers Muir and Hawley down to the Electric Cottage and saw the articles, and she there pointed out and identified in the presence of the officers some of the property that had been in the Half Way House and store. She also testified that she went with them to the house on Meigs street, and that some of the articles named in the proofs of loss were there, but she did not testify that she pointed out any of the articles to the officers.

The People then called Officer Muir, who testified that he went with Miss La Violette to the Smith house, on Meigs street, and that she there pointed out to him many articles, of which he produced the list, and the defendant's objection to its competency being overruled and the defendant excepting, he further testified that she identified all the property with the exception of some books as coming from the Boulevard, that is, from the Half Way House and store. In like

manner, under like objection and exception, the officer testi-
fied that Miss La Violette, on the same day, pointed out to
him at the Boulevard several articles of the like kind named
in the proofs of loss.

It was competent for the officer to enumerate the articles
he saw at the house in Meigs street and down at the Boule-
vard, and to describe them. Such evidence might assist the
jury in identifying the articles with those set forth in the
proofs of loss. But it was not competent for him to testify
that Miss La Violette identified the articles, or pointed them
out to him, as the same mentioned in the proofs of loss. In
effect, his testimony was that she told him the same story out
of court that she had testified to in court. Officer Muir's tes-
timony as to her acts and declarations was not competent to
support her testimony as to the identity of the articles with
those in the proofs of loss; but when adroitly adduced under
the sanction of the court it might seem to the jury to be a
conclusive corroboration, and they might believe, as they prob-
ably did, that, as she was thus corroborated in this particular,
she probably told the truth in other important particulars as
to which she was contradicted or her truthfulness challenged.

3. Miss La Violette was also permitted, over the defend-
ant's objection and exception, to testify to the acts and declara-
tions of Mrs. Frances M. Smith, the mother of the defendant,
in his absence, on the day before the fire, tending to show, in
connection with the subsequent fire, her removal of some arti-
cles from the Half Way House in anticipation of the fire. In
overruling the defendant's objection the trial court said: " Re-
ceived, because I suppose the evidence will follow up the same
line it did in the other case (meaning the trial before the same
court of the defendant's father upon the same indictment, upon
which he was convicted, which trial and conviction were suffi-
ciently alluded to upon this trial to enable the jury to under-
stand the reference made by the court), and there is no doubt
in my mind but there was evidence to go to the jury on the
question of conspiracy between all these people."

Thus the court assumed, for the purpose of receiving the testimony, the existence of a conspiracy, not upon the evidence adduced in this case, but upon evidence alleged by the court to have been received in another case, which was quite satisfactory to the mind of the court. What the evidence was in the other case we do not know; whether the same was afterwards given in this case we do not know. That case and the evidence of a conspiracy in it were irrelevant and incompetent here, but, nevertheless, they were cast into the scale to the prejudice of the defendant, enhanced in influence by the declarations and approval of the court, the true weight and merit of which the jury had no other means of determining and were not at liberty to know. People v. Corey, 157 N. Y. 332. Moreover, there is no direct evidence that the fire was of incendiary origin. The remarks of the court, assuming that the jury knew of the conviction of defendant's father, tended to ease their minds of scruples on that score.

4. Thomas Bidwell was a witness for the People. He lived with the Smiths at the time of the fire. He was about fifty years old, was a cripple, and, before accepting the protection and entering the service of the Smiths, he had lived and wandered with the gypsies. After the fire he seemed to have fallen under the influence of Miss La Violette, and he gave important testimony as to the articles mentioned in the proofs of loss but not destroyed by the fire. He testified, over the objection and exception of the defendant, that the Smiths promised to pay him ten dollars per month, but never paid him. This was error. Other testimony as to which the defendant's objection to its irrelevancy was, perhaps, properly overruled, tended to disparage the methods of the Smiths, and thus their moral character, and makes it clearer that this testimony of Bidwell, which could be grouped with the other, was prejudicial to the defendant.

5. The defendant requested the court to charge: " That before the jury can convict this defendant the evidence must

be so strong as to remove every other hypothesis than that of the defendant's guilt. ·

"By the court: I decline to charge in that language.

"Exception.

"By the court: I charge that it must be sufficient to remove every reasonable hypothesis. Exception."

The request was not technically proper, since the rule is that the evidence must, to a moral certainty, or beyond a reasonable doubt, exclude or remove every other hypothesis than that of the defendant's guilt. Ruloff v. People, 18 N. Y. 194; People v. Fitzgerald, 156 N. Y. 253. But the qualification was improper, since it is difficult to conceive how any hypothesis of the defendant's innocence that remains reasonable under the evidence can be removed by it. · The hypothesis of innocence must appear by the evidence to be unreasonable in order to be excluded or removed by the evidence. Doubtless the learned trial judge did not aptly express his own meaning. But his refusal to charge, followed by such a qualification, was confusing to the mind. The jury might have understood that the evidence need not be so strong as to remove to a moral certainty every other hypothesis than that of the defendant's guilt or every reasonable hypothesis of his innocence.

6. In opening the case to the jury the district attorney used this language: "We shall show you, if permitted, that before this fire, which occurred at the Boulevard, in which some seven buildings owned by the mother and family of this defendant were burned, many other buildings which this defendant had assisted in erecting, or in which he was interested, were destroyed in a similar manner. Within less than a year before the fire on the Boulevard——"

Before this statement was completed the counsel for the defendant raised the objection that it was improper. This objection was, however, overruled by the court, to which ruling an exception was taken, whereupon the prosecuting attorney

remarked: "If counsel insists upon it, I will not go into the matter at this time."

The statement made by the district attorney was thus approved by the court and may have had a prejudicial influence with the jury. If the district attorney had the right to make the proof he proposed he did not make it, and thus may have prejudiced the defendant by a charge he could not or did not intend to support; if the district attorney had no right to make the proof then the charge, although no more harmful to the defendant, was a more reprehensible invasion of his rights. In this case the defendant did not by his own hand burn or set the building on fire. The charge is that, although three miles away at the time, his father did it in the execution of a conspiracy with defendant. There could have been no innocent conspiracy to do such an act, no execution of it by honest inadvertence. *Res ipsa loquitur* as to the willfulness of such an act.

The second count of the indictment charges arson in the third degree, in that it omits to charge, as the first count does, that it was committed in the night time, and charges that it was committed with the intent to prejudice the insurer thereof; the manifest office of the second count was to prepare the way to use the evidence under it to secure conviction upon the first count. To admit evidence also that the defendant had committed the like offense before, would be to permit evidence of one to secure conviction of another.

This case is unlike the cases of larceny by trick or device, obtaining money under false pretenses, receiving stolen property knowing it to have been stolen, passing counterfeit money knowing it to be such, where the intent is determinative of the crime, but often remains in doubt when but the single transaction charged in the indictment is unfolded. An honest man may by chance be confronted by all the accusing circumstances and yet be innocent. If, however, it should appear that a person thus confronted and protesting his innocence, had been involved in the like circumstances upon former occasions, con-

fidence in his honesty would probably be replaced by a conviction of his rascality. Many cases illustrate this view, and show when such evidence is admissible. People v. Jefferey, 82 Hun, 409; People v. Dimick, 107 N. Y. 13; People v. Everhardt, 104 id. 591; People v. Altman, 147 id. 473; Copperman v. People, 56 id. 591; Mayer v. People, 80 id. 364. They have no application here.

It is difficult to lay down an inflexible rule applicable to irrelevant statements by the public prosecutor to the prejudice of the defendant. In some cases it is manifest they do no harm In others, where the case depends upon a mass of circumstances, many of which are contradicted, others equivocal except as light is reflected upon them by their association, it is more important that nothing but proven and relevant facts should be brought into the whole field of observation from which the jury are to deduce their conclusion. And as the field enlarges it is the more important that care should be taken to prevent the mingling of mere statement with fact. Enough has already been said to show that the case before us is of the latter kind. If the court had sustained the objection of the defendant, the jury would have been instructed as to the range of the inquiry. As the court overruled it, they understood the district attorney to be speaking within proper limits, and they might have inferred that they were dealing with an old offender.

The judgment should be reversed and a new trial granted.

PARKER, Ch. J., O'BRIEN, BARTLETT, MARTIN and VANN, JJ., concur; HAIGHT, J., concurs in the third proposition only expressed in the opinion.

Judgment reversed, etc.