### PEOPLE v. BISSERT.

(Supreme Court, Appellate Division, First Department. April 11, 1902.)

1. BRIBERY—POLICE OFFICERS—INDICTMENT PENDING FORMER INDICTMENT—
VALIDITY.

Code Cr. Proc. § 962, requires its application to all criminal actions and proceedings; section 320 provides that the validity of an indictment may be tested by demurrer; section 325, that the court must give judgment on the demurrer; and section 326, that, if the demurrer be allowed, the judgment is final, and bars another prosecution, unless the court, believing that the objection may be obviated by a new indictment, directs a resubmission to the grand jury. Laws 1886, c. 593, repeals all statutes relating to criminal practice prior to the Criminal Code, except Rev. St. pt. 4, c. 2, tit. 4, art. 2, § 42, providing that, if two indictments for the same offense are pending against an accused, the indictment first found shall be superseded by the second, and shall be quashed. Accused was indicted for taking a bribe on June 17, 1901, and pending

decision on demurrer thereto another indictment was obtained for the same offense, on which was indorsed, "Superseding the indictment filed June 17, 1901," and the first was indorsed, "Superseded by indictment filed June 20, 1901." Trial was had and accused was convicted on the second indictment. *Held*, that such second indictment was valid, since the Code of Criminal Procedure, relating to demurrers, controls only in cases of indictments remaining uncanceled, and not to those superseded and quashed by an independent law. Per Patterson, Laughlin, and O'Brien, JJ.

2. SAME—ACCOMPLICES—CORROBORATING EVIDENCE.

Where an officer is prosecuted for accepting a bribe to permit, without interference, a breach of the law, the person paying the bribe is an accomplice, on whose testimony alone the officer cannot be convicted, under Code Cr. Proc. § 399, requiring corroboration of accomplices. Per McLaughlin, J.

3. SAME—STATEMENTS IN ACCUSED'S PRESENCE—ACQUIESCENCE.

On a prosecution of a police officer for taking a bribe from the proprietress to permit, without interference, a house of prostitution, testimony by an inmate that, on the occasion of a raid of the house by such officer, she heard the proprietress ask him why he did this, saying, "You took money, and now you are chasing out the girls," and that she did not hear any reply, is inadmissible to show that such officer acquiesced in the statement as to the giving of the bribe, where it was not shown that he was in a position to hear, nor that he remained silent; and, besides, he was a public officer, and was not bound to reply to charges made against him. Per McLaughlin, J.

4. SAME—CORROBORATING EVIDENCE.

On a prosecution of a police officer for accepting a bribe, evidence that several days before the payment of the money the person paying it drew approximately the amount paid from a bank is inadmissible to corroborate the person paying it, without proof tracing the money to the officer's possession. Per Van Brunt, P. J., and Laughlin and McLaughlin, JJ.

5. SAME.

On a prosecution of a police officer for taking a bribe to permit, without interference, a house of prostitution, evidence that the proprietress, who paid the bribe, purchased furniture afterwards for the house, is inadmissible. Per Van Brunt, P. J., and Laughlin and McLaughlin, JJ.

6. SAME—REMARKS OF PROSECUTOR—PREJUDICIAL ERROR.

On a prosecution of a police officer for accepting a bribe from the proprietress of a house of prostitution, remarks by the prosecutor, in his opening, that it was a matter of common knowledge that such houses could not be run in New York City without the consent of the police, and that the jurors, when they were accepted, did not lay aside that common knowledge, and, in his closing argument, that, if the jury did not find accused guilty, they would become particeps criminis in the horrible crime of taking blood money, are prejudicial to accused, requiring reversal. Per Van Brunt, P. J., and Laughlin and McLaughlin, JJ.

Appeal from court of general sessions, New York county.

George Bissert was convicted of bribery, and he appeals. Reversed.

Argued before VAN BRUNT, P. J., and McLAUGHLIN, PATTERSON, O'BRIEN, and LAUGHLIN, JJ.

J. Rider Cady, for appellant.

Howard S. Gans, for the People.

McLAUGHLIN, J. This appeal is from a judgment convicting the defendant of the crime of bribery. The indictment upon which the conviction was obtained charged, in substance, that on the 15th

of October, 1900, the defendant accepted from one Lena Schmidt $550, under an agreement that he, as a police officer of the city of New York, would permit her to conduct a house of prostitution at a place specified in the precinct over which he had charge. Prior to the finding of the indictment upon which the defendant was tried and convicted, another indictment was found by the same grand jury, upon the same evidence, charging the defendant with the commission of the same offense "within two years prior to the finding of the indictment." The defendant was taken into custody by virtue of the indictment first found, and, on being arraigned, a demurrer was interposed upon several grounds. The issue raised by the demurrer was tried, and intermediate the trial and a decision thereon the second indictment was obtained, which was indorsed, "Superseding the indictment filed June 17, 1901;" and the first one was indorsed, "Superseded by indictment filed June 26, 1901." At the close of the people's case a motion was made for the discharge of the defendant, and for the dismissal of the second indictment, upon the ground, among others, that the grand jury had no power to find the same. The motion was denied, and an exception taken, the validity of which is one of the grounds urged for a reversal of the judgment of conviction. Whether the exception was well taken necessarily depends upon the question of whether the grand jury had jurisdiction of the subject-matter of the indictment; and this, of course, depends upon the powers given to the grand jury by the statutes relating thereto. The Code of Criminal Procedure (chapter 442 of the Laws of 1881, as amended) prescribed the procedure which must be followed in all criminal cases. The purpose of the act is indicated in section 962, which provides, "This Code applies to criminal actions and to all other proceedings in criminal cases which are herein provided for from the time it takes effect." It took effect on the 1st day of September, 1881. Paragraph 63. The manifest purpose of the legislature in the enactment of this statute was to harmonize all of the statutes of the state in relation to criminal practice, and to substitute in place thereof a complete and uniform system of criminal procedure. This was the view entertained by the court of appeals in People v. Hovey, 92 N. Y. 558, where it was said:

"The general object and design of the Code of Criminal Procedure was to collect the various statutes relating to the subject, and to furnish a uniform, harmonious, and comprehensive system of criminal practice, to apply to and govern all criminal proceedings thereafter instituted in any of the courts of the state."

See, also, People v. Jaehne, 103 N. Y. 182, 8 N. E. 374. And independent of the construction put upon the Code by the court of appeals, the slightest consideration of the various sections of it is sufficient to indicate that it was intended by the legislature that this Code was to take the place of, and be substituted for, all of the statutes of the state bearing upon the subject, to which end provisions were made for every necessary step to be taken in every criminal case, commencing with the formation of a grand jury, leading up to a trial, conviction, sentence, or discharge of a defendant. The powers and duties of the grand jury are defined (sections 223–250); the

findings which may be made, and the manner of presentment (sections 268–276); what must be the form of the indictment, when one is presented (section 276), as well as what the indictment must contain (section 274); and in case an indictment is found, and the defendant is taken into custody by virtue thereof, how he may test its validity,— either by motion to set aside for certain irregularities specified (section 312), and, if such motion be granted, that the order made in pursuance thereof is not a bar to a future indictment for the same offense (section 320), or by a demurrer, and, if a demurrer be interposed, the same "must be heard at such time as the court may appoint" (section 325); and after a trial had in pursuance of the demurrer "the court must give judgment upon the demurrer, either allowing or disallowing it, and an order to that effect must be entered upon the minutes" (section 326); and, "if the demurrer be allowed, the judgment is final upon the indictment demurred to and is a bar to another prosecution for the same offense, unless the court, being of the opinion that the objection on which the demurrer is allowed may be avoided by a new indictment, direct the case to be re-submitted to the same or another grand jury" (section 327); and "if the court do not direct the case to be re-submitted, the defendant, if in custody must be discharged, or if admitted to bail his bail exonerated, or if he has deposited money instead of bail, the money must be refunded to him" (section 328). These and other sections, it will be observed, cover the entire subject, and especially as to the practice to be pursued when a defendant has been taken into custody under an indictment, and has challenged its sufficiency by demurrer, and show that with the interposition of the demurrer the court becomes possessed of the whole case, and must determine whether the alleged case against the defendant is to be allowed to go before a jury; it being expressly given the power in a proper case to sustain the demurrer, and to make that determination a bar to any further prosecution for the same offense. After the court has obtained the jurisdiction to determine this question, there is no provision in the law which permits the same or any future grand jury to deprive the court of the jurisdiction acquired. The defendant has obtained a vested right to the judgment of that tribunal, precisely as he would have if he had been put on trial upon a plea of not guilty.

If the demurrer be allowed, then the defendant must be discharged, and the judgment allowing the demurrer is a bar to another prosecution for the same offense, unless the court orders that the case be resubmitted to the same or another grand jury. It is the order of the court which gives the grand jury jurisdiction to make a second investigation, and render a second indictment in pursuance of it. But the court cannot make this order until after it has disposed of the demurrer. A demurrer is a trial upon issues of law, and it is only upon the termination of that trial that an order can be made. Therefore, when the defendant demurred in the case at bar, there was no power in the grand jury, in the absence of an order by the court, to again investigate the same charge, or find a second indictment. It had no more power in this respect than it would have had after the case had been submitted to the

jury, and before it had rendered a verdict. If this is not so, any grand jury could, by finding another indictment, oust the court of a jurisdiction which has been expressly conferred upon it, and nullify the power given to the court to determine, where there has been a demurrer, whether a new indictment will be permitted or not. But it is urged in this connection that part 4, c. 2, tit. 4, art. 2, § 42, of the Revised Statutes, modifies the provisions of the Code referred to, and authorizes a second indictment. This section of the statute provides that:

"If there be at any time pending against the same defendant, two in-dictments for the same offence; or two indictments for the same matter, although charged as different offences, the indictment first found, shall be deemed to be superseded by such second indictment, and shall be quashed."

This section formed a part of the Revised Statutes which were in force at, and had been in force for a long time prior to, the adoption of the Code of Criminal Procedure; and under the well-recognized rule that where a later statute, not purporting to amend a former one, covers the whole subject, and is plainly intended to furnish the only law thereon, it would be held to have been repealed by necessary implication (Heckmann v. Pinkney, 81 N. Y. 215), were it not for the existence of chapter 593 of the Laws of 1888. This statute expressly repeals all of the sections of the statutes relating to criminal practice prior to the adoption of the Criminal Code, except section 42; and this exception indicates an intention on the part of the legislature to re-enact and keep in force that section, for which reason the same must be construed in connection with the provisions of the Code bearing upon the same subject, and, if possible, force be given to both. This I think can be done. The Code provides the manner in which an indictment shall be found, and the practice to be pursued after a defendant has been taken into custody thereunder; but no provision seems to have been made as to what may be done by the people for the purpose of perfecting an indictment intermediate the finding of the same and the taking of the defendant into custody. The district attorney, in case he finds any defects in the indictment, may, under section 42 of the Revised Statutes, resubmit the case to the same or another grand jury, and it may correct any technical defects which may be found in the original indictment, and upon the second indictment the defendant may be arraigned and tried. Giving section 42 this construction, it does not destroy, nor does it in any way interfere with, the provisions of the Code of Criminal Procedure, but, on the contrary, gives full effect to them. It not only does this, but it enables a prosecuting officer to correct technical defects which he may discover in an indictment before the defendant has been required to plead to it. But after a defendant has been arraigned under an indictment, and has challenged the right of the people to deprive him of his liberty under it, this section of the statute cannot be resorted to for the purpose of finding a second indictment, because to do so would destroy and render nugatory all of the provisions of the Code of Criminal Procedure relating to or bearing upon the subject. In the case before us the defendant

had been taken into custody under the first indictment. He had been deprived of his liberty by the people. He challenged their right to take such action, and he could not again be deprived of his liberty for the same offense until the validity of his challenge had been determined, and then only in the way provided by law. If I am right in this, then the grand jury had no jurisdiction to find the second indictment, and for that reason the motion to dismiss should have been granted. This does not mean that the defendant could not thereafter be tried for the crime charged in the indictment. On the contrary, he could be tried if the demurrer which he interposed were overruled, or, if it were allowed, then the court might order that the charge made against him be reconsidered by the same or another grand jury.

I am also of the opinion that errors were committed upon the trial, both in the reception of evidence, as well as in the unauthorized statements made by the learned district attorney in the opening and summing up to the jury, which, independent of the question already discussed, necessitate a reversal of the judgment of conviction. As to the first, the charge which the people made against the defendant was that he, while a police officer, accepted from one Lena Schmidt $550, under an agreement that he would permit her to violate the law; and, to establish the truth of this charge, Lena Schmidt was sworn. She testified, in substance, that at the time specified she gave to the defendant $550, with the understanding on his part that he would permit her, without molestation or interference, to conduct, at a place specified, a house of prostitution. If she paid to the defendant this sum for the purpose specified, she was equally guilty with the defendant, because she aided and abetted in the commission of the crime. She was an accomplice, and therefore, by express provisions of the statute (section 399 of the Code of Criminal Procedure), the defendant could not be convicted upon her testimony alone. It required corroboration. Appreciating this, the people produced a witness by the name of Nettie Drexler, who testified that she was an inmate of the house kept by Lena Schmidt, and upon a certain occasion this house was raided by the police; that she there saw the defendant, and heard a conversation which took place between him and Lena Schmidt. She was then asked:

"Q. What did you or Mrs. Schmidt say to Bissert, and what did you hear Bissert say to Mrs. Schmidt, at that time? A. She asked him— She says: 'Why did you do this? You took money, and now you are chasing out the girls.' Q. What did you hear Bissert say, if anything? A. I did not hear what answer he gave."

The defendant moved to strike out this testimony upon the ground that the conversation had was only admissible upon the theory that the defendant acquiesced in the statement made by Lena Schmidt as to the giving of the bribe, and that such acquiescence could not be implied, inasmuch as it did not appear what answer the defendant made. The motion was denied, and an exception taken. This motion should have been granted. The evidence was manifestly improper. The only ground upon which it can be claimed that it

was admissible is that it amounted to an acquiescence on the part
of the defendant that the statement made by the witness was true,
and therefore binding upon him. But his acquiescence certainly
could not amount to an admission, unless he heard what it was the
Schmidt woman said, and the circumstances attending the accusa-
tion were such that he was bound to answer it, and, instead of do-
ing so, remained silent. Here there is neither evidence that the
defendant was in a position to hear or understand what the Schmidt
woman said, nor that he remained silent. On the contrary, it can
as fairly be inferred that he answered, as that he remained silent.
The answer of the witness, when interrogated as to what he said,
was: "I did not hear what answer he gave." Evidence of this
character has been recently considered by the court of appeals, in
People v. Koerner, 154 N. Y. 374, 48 N. E. 736, and People v. Ken-
nedy, 164 N. Y. 456, 58 N. E. 652. In the former case the court
said:

"When the claimed acquiescence is in the conduct or in the language of
others, it must plainly appear that such conduct or language was fully known
and fully understood by the party, before any inference can be drawn from
his passiveness or silence. Moreover, the circumstances must not only be
such as to afford him an opportunity to act or speak, but also such as
would properly or naturally call for some action or reply from men similarly
situated. Declarations or statements made in the presence of a party are
received in evidence, not as evidence in themselves, but to ascertain what
reply the party to be affected makes to them. If he is silent when he
ought to have denied, the presumption of acquiescence arises, but it is clearly
otherwise when his silence is of a character which does not justify such an
inference."

And in the latter case it was held:

"There are circumstances under which the declarations of persons, made
in the presence of the accused, are competent; but they are regarded as
dangerous, and should always be received with caution, and should not be
admitted unless the evidence clearly brings them within the rule. Declara-
tions or statements made in the presence of a party are not received as
evidence in themselves, but for the purpose of ascertaining the reply the
party to be affected makes to them. They are only competent when the
party affected hears and fully comprehends the effect of the words spoken,
and when he is at full liberty to make answer thereto, and then only under
such circumstances as would justify the inference of assent or acquiescence
as to the truth of the statement by his remaining silent."

If the rule announced in these cases is the correct one, it does
not require argument to demonstrate that the evidence here under
consideration was improper, and for that reason should have been
stricken out.

Nor do I think, under the circumstances, was the defendant bound
to reply, even conceding that the statement was made as testified
to, and the defendant heard it and made no reply thereto. He was
a public officer, and, at the time the accusation was made, was in
the discharge of a duty imposed upon him by law. Was he bound
to reply to every accusation then made against him? And if he
did not, could that fact be used to establish that he himself was
guilty of a crime? I do not think so. The circumstances were such
that he was not bound to reply to charges made against him by
persons confessedly violating the law.

Error was also committed in receiving evidence to the effect that Lena Schmidt, several days before it is alleged she gave the money to the defendant, drew from a certain bank $450. It is not claimed that the defendant induced her to draw this money from the bank, or that any of it was traced into his possession. Under such circumstances, how can it be said that the fact that she drew this amount of money from the bank tended in the slightest degree to establish that the defendant accepted a bribe, or corroborated the testimony of the witness Schmidt? Had the money drawn from the bank been traced into the defendant's possession, or had there been established some fact from which that inference could be properly drawn, then it might be considered by the jury; but, in the absence of such evidence, to permit the jury to consider it was to allow them to speculate,—to guess that that money ultimately went into the hands of the defendant. A person cannot be convicted of the commission of a crime upon a speculation or guess. Nor can it be said to be evidence in corroboration of the witness Schmidt. Corroborative evidence, whether consisting of acts or admissions, must at least be of such a character as tends to prove the guilt of the accused by connecting him with the crime charged. People v. Page, 162 N. Y. 272, 56 N. E. 750. And in this same connection other evidence of a similar character was erroneously received, which it is unnecessary to consider at length. For instance, the people were permitted to prove that, immediately following the time the bribe is alleged to have been given, the witness Schmidt purchased different articles of furniture, which went into the house which she afterwards conducted. How can it be said with any reason that this testimony tended either to establish that the defendant was guilty of the crime charged against him, or that it corroborated in the slightest degree the testimony of the witness Schmidt?

As to the second: In opening the case to the jury, the learned district attorney said:

"Now, the prosecution claims, at the outset of this case, that there is not a newsboy in this town, that there is not a business man in this town, that there is not a man of ordinary common sense that walks the streets of this town, but who knows that no house of prostitution can run in this town without the consent and approval of the police, and that that man does not live in New York City, that has common sense, that does not know the plain and palpable facts."

The counsel for the defendant interrupted the district attorney, when the foregoing statement was made, and thereupon the following colloquy took place between him and the court:

"Mr. Levy: I beg your honor's pardon, and I regret to interrupt my friend; but I desire to object to the last statement of the district attorney as improper, and not within the purview of this indictment, and as not within the limits of the indictment, and as not a proper part of an opening of a district attorney. The Court: Go on, Mr. district attorney. Mr. Levy: And I ask your honor to instruct the jury at this time to disregard the statement of the district attorney that there is not any man in this community but who knows that no house of prostitution can run in this community without the knowledge and approval of the police. The Court: I think the statement is outside of the issue raised by the indictment. Mr. Levy: Will your honor instruct the jury as I request? The Court: I instruct the jury that the state-

ment objected to is not within the issue raised by this indictment, and you
must eliminate it from your consideration, gentlemen. Mr. Levy: Will your
honor instruct them to disregard it? The Court: I shall not instruct them
further. Mr. Levy: I take an exception."

Thereupon the district attorney continued:

"No wonder my friend Mr. Levy would rise up and object when I say that
it is within the common knowledge of you gentlemen of the jury, and will
be proved in this case, that, with the number of men in the precinct, with
the machinery that is within the power of the police to exercise, and with
the knowledge of men walking up and down the streets, and appointed to a
particular duty, that it is not within the power of men not to know it, and
that this woman is corroborated when she says that she ran that house there
with the consent of the police, and that the prosecution claims that it is
corroboration, within the ordinary knowledge of mankind, which you do not
lay aside when you take your seats in the jury box, that that house could
not run in that precinct without the knowledge of the police of that precinct.
Mr. Levy: I object and take an exception to that statement. Mr. Osborne:
I claim that I am clearly within the law of evidence on that point. * * *
In the present instance we cannot attack the tree, but we have here one of
its branches, and we must begin there; and we call on this jury, in the
name of their desire to promote the welfare of this community, to bring to
bear upon this case their common, ordinary intelligence, and to recollect, as
I said before, that, to a large extent, the morals of the community rest upon
the morals of a jury, and that your verdict will either tend to continue this
system, or that it will tend to end it. Mr. Levy: To the last remark of the
district attorney we desire to object, if your honor please, and except,—that
their verdict will tend to continue an alliance between the police and houses
of prostitution,—as being improper, and not being within the purpose of an
opening address, and as an improper statement. The Court: Call your wit-
ness, Mr. district attorney. Mr. Levy: We except."

Thus we find at the very beginning of the trial the people claiming
that the defendant could be convicted, not upon evidence alone, but
upon the knowledge possessed by the jury, independent of evidence,
and which knowledge they did not lay aside when they were ac-
cepted as jurors. When the court's attention was called to such
statements, instead of promptly checking them, and instructing the
jury to entirely disregard the same, he impliedly approved of them,
by directing the district attorney to call a witness. The prejudicial
effect of these statements becomes apparent when the same are con-
sidered in connection with the statement of the district attorney in his
summing up at the close of the trial, when he again repeated them.
He said:

"And I repeat that there is not a single boy in the precinct, that there is
not a newsboy in the precinct, that does not know the fact to be the truth,
that no house of prostitution, that no gambling house, no unlawful establish-
ment of any kind, can exist in a precinct without the knowledge of the
captain, and without the knowledge of the special officer. And nobody
knows that better than the defendant himself. I ask the jury if they are
going to stultify themselves, if they are going to unite themselves with the
police alliance with houses of prostitution, and if they are going to make
themselves particeps criminis in the horrible crime of taking blood money.
I would not take it. I would not take it if I had to resign forever my posi-
tion as a district attorney, and if I had to sink into such insignificance that
you could not find me with a microscope; and I hope there is not a man on
this jury who would take it, and I do not believe there is. * * * I want
you to ask yourselves whether you will ever convict a police officer of taking
a bribe, if you do not do it in this case. I tell you, gentlemen of the jury,
if you do not, you might as well tell the police to 'go ahead and blackmail

all you want,' because the district attorney cannot get a jury to exercise their reason. You might as well shout and proclaim all over the United States that every public officer, district attorney, or anybody else, can take a bribe, if he wants to, if you will not convict in this case. * * * We are now dealing with a case which may mark a period in the history of our great community. We are confronted with a wall. We stand facing that wall as a Hindoo Brahman sometimes does,—facing it, with no possibility of getting over it or through it; and he stands there, year in and year out, facing that wall. That is the way this community has stood with regard to this police situation. * * * There have been a good many fights for liberty in the world. Peace has her victories, as well as war, and the fight for freedom has not ended yet; and I say that you, gentlemen, can help along, a little bit, the cause of freedom. * * * Consequently, if you say, on this evidence, corroborated as this woman is, that you will not convict, then give a license to every police officer and to every public officer to take money as a bribe whenever he pleases. * * * Now, gentlemen, what is the use of teaching the children in this community that honesty is the best policy? What is the use of trying to give them any theoretical lessons in morality, when they see the houses of prostitution open in this precinct, and when they know that the officers of the law that are put there to close them up are really using them for their own private profit?"

The defendant's counsel, during the course of the summing up of the district attorney, undertook to prevent such statements, and was promptly checked; the court saying:

"Now, you should not interrupt the district attorney. You were not interrupted, Mr. Vorhaus, and Mr. Levy was not interrupted. Mr. Vorhaus: Well, we will keep our objections until the end, your honor."

The district attorney was thereafter permitted to make such statements as he saw fit, without interruption by counsel or the court; and, when he had finished his remarks, defendant's counsel sought to except to some of them, and the following occurred:

"The Court: What is this? A summing up by the defense? Mr. Vorhaus: No, sir; I am excepting to the remarks of the district attorney. I am quoting them. The Court: Do you think that this court has nothing to do except to listen to exceptions by counsel on either side to the summing up? Mr. Vorhaus: I understood your honor to say we should defer our exceptions until the district attorney had closed. The Court: Oh, such practice is trivial, Mr. Vorhaus. Mr. Vorhaus: Well, what other remedy have we against the improper remarks of the district attorney? The Court: I am not here to prescribe remedies. I am here to preside over this trial, and the proposition that counsel, who may have had a couple of hours each to talk, would have the right to jot down everything that each other may say, and raise objections to it, would simply mean a continuation of objections and exceptions, and a never-ending argument."

The defendant's counsel thereupon called the attention of the court to the fact that the court of appeals had recently reversed judgments of conviction by reason of improper remarks on the part of district attorneys, and the court then said, "Very well, then, go on," and exceptions were then taken.

The statement made by the district attorney in his opening, to the effect that it was a matter of common knowledge that houses of prostitution could not be run in the city of New York without the consent and approval of the police, and that the jurors, when they were accepted, did not lay aside that common knowledge, was unauthorized, and ought not to have been made; and the jury should have been immediately told by the trial court to disregard the state-

ment, inasmuch as the oath which they had taken required them to render a verdict solely upon the evidence. The statement of the district attorney in his closing was equally prejudicial to the defendant, in which he stated, in effect, that, if the jury did not find the defendant guilty, they would become particeps criminis "in the horrible crime of taking blood money." Other statements were equally as bad. The language used by Judge Vann in reversing the judgment of conviction in the Fielding Case, 158 N. Y. 542, 53 N. E. 497, 46 L. R. A. 641, 70 Am. St. Rep. 495, is just as applicable in this case as it was in that. He said:

"The average man cannot read the eloquent but inflammatory language of the district attorney without being impressed by it, and it is safe to presume that the effect would be heightened by hearing those words spoken with animation and enthusiasm, under the existing circumstances surrounding an important criminal trial. The jury might be told by the court to forget them, but could they forget them? They might be told to disregard them, but how can we be certain that they did disregard them? Moreover, some of the most objectionable language was not alluded to by the court in its charge, and instructions to the jury do not always neutralize, either as matter of law or fact, the effect of improper remarks in their presence. People v. Corey, 157 N. Y. 332, 346, 51 N. E. 1024; Brooks v. Railway Co., 156 N. Y. 244, 252, 50 N. E. 945; People v. Hill, 37 App. Div. 327, 56 N. Y. Supp. 282; Swan v. Keough, 35 App. Div. 80, 54 N. Y. Supp. 474. From our observation of jurymen, we think the language under consideration would be apt to turn their minds against the defendant, divert their attention from the evidence, and prevent the exercise of sound and dispassionate judgment upon the merits."

It seems unnecessary to add anything further, because, if the language used by the district attorney in this case is compared with that used in the case in which the above remark was made, as well as in the Mull Case, 167 N. Y. 247, 60 N. E. 629, it will be found that it is much more subject to criticism than that used in either of those cases. See, also, People v. Smith, 162 N. Y. 520, 56 N. E. 1001; People v. Milks, 55 App. Div. 372, 66 N. Y. Supp. 889; People v. Smith, 55 App. Div. 368, 66 N. Y. Supp. 886; People v. Ray, 36 App. Div. 389, 55 N. Y. Supp. 410.

The defendant was entitled to a legal trial, conducted in a proper way, and convicted, if at all, upon evidence such as the law approves. This he did not have. The trial was illegal, for the reason that the grand jury acted without jurisdiction in finding the indictment under which the trial was had, improper evidence was received, and the method pursued by the prosecuting officer was such as the law does not sanction. Nor is it any answer to this suggestion to say that the defendant is guilty of the crime of which he has been convicted. Such suggestion only begs the questions. The guilt or innocence of the defendant must be determined by a jury, and not by the court; and, if the court usurps the province of the jury in this respect, it takes from the defendant what the constitution of the state has guarantied to him, viz., trial by jury. This same suggestion was made in People v. Mull, supra, and the court of appeals effectually disposed of it by saying:

"If it be said that in the case before us there is no reasonable doubt of the defendant's guilt, it should be remembered that it is not for the courts, but for the jury, to say this by their free and impartial verdict; and we

cannot know that they have said it, when we do know that they were told by the district attorney * * * that their own good repute was in jeopardy, and could only be saved by convicting the defendant."

I am of the opinion, therefore, for the reasons given, that justice requires that the defendant should have a new trial.

VAN BRUNT, P. J., concurs.

LAUGHLIN, J. (concurring for reversal). I am of the opinion that, for the reasons assigned in the opinion of Mr. Justice PATTERSON, the second indictment was regularly found and is valid; but I concur in that part of the opinion of Mr. Justice McLAUGHLIN which holds that the reception of the testimony of Nettie Drexler concerning what was said to the defendant by Mrs. Schmidt, to which she did not hear the defendant's reply, was reversible error, and also in that part of his opinion which holds that the conduct of the assistant district attorney was also reversible error. I think that the test by which it should be determined whether a trial, either civil or criminal, is to be permitted to stand, or is to be rendered nugatory for something outside of the evidence occurring in the court room, should be whether the presiding justice properly conducted the trial, or was guilty of any error in regulating the conduct of the jurors, attorneys, counsel, or spectators. If the judge performs his full duty, it ought not to be in the power of any one to render the trial fruitless upon such grounds. If an attorney or counsel, either in his opening or closing remarks, or during the trial, attempts to say or says something improper, I doubt whether there is any case where it would not be within the power of the presiding justice, by administering a proper rebuke and sufficiently admonishing the jurors, to remedy the error, and prevent any injurious consequences; and, in case of his failure to so act, the criticism of the appellate court in reversing should fall upon him as well as upon the attorney or counsel. But the court of appeals has apparently decided that in criminal cases, at least, reversible errors may occur, owing to the impassioned remarks of a district attorney, even though the trial justice does his full duty. Consequently district attorneys and their assistants should conform their conduct to the limitations prescribed by the court of appeals, and conformity thereto should be compelled by the justice presiding. In the case at bar I think the bounds of propriety were overstepped by the district attorney far more than in cases where the court of appeals has seen fit to reverse on that ground. I therefore vote to sustain the second indictment, and also for a new trial, for the reasons stated.

PATTERSON, J. I am unable to concur in the opinion of Mr. Justice McLAUGHLIN written in this case, or in the conclusion that the judgment of the court of general sessions of the peace should be reversed. Prominently appearing in the record is the fact that the rights of the defendant, as they are related to the merits of the case, were so carefully protected by the recorder who presided at the trial that not a single exception was taken to his charge. The defendant's

counsel were so thoroughly satisfied with it that they declared the court had so fully covered everything they had requested in the way of instructions that they withdrew all of their proposed requests to charge. That disposes of much of the argument that the defendant was not accorded a fair trial. He and his counsel were, at least, content with the manner in which the case ultimately went to the jury; and we are therefore only to inquire whether his legal rights were denied by the violation of substantial provisions of law, or by material errors committed during the progress of the trial relating to matters of evidence, or whether such misconduct of those engaged in the prosecution occurred as to satisfy an appellate court that the verdict of the jury, finding the defendant guilty, must have been influenced by such misconduct.

In the first place, the authority of the district attorney to put the defendant on trial at all is challenged. The facts connected with that challenge are very simple. The indictment upon which the defendant was tried and convicted was found to be a true bill by the grand jury on the 26th day of June, 1901. It was found under sections 72 and 48 of the Penal Code. The grand jury previously and at the same June term, to wit, on the 17th of June, 1901, had found another indictment against the same defendant under section 72 of the Penal Code. On the same day, according to the indorsement on the first indictment, the defendant pleaded "Not guilty," but on the 20th of June, that plea was withdrawn, and a demurrer to the indictment was filed. Argument was had thereupon on the 21st of June, 1901. On the 26th of June, 1901, the first was declared superseded by the second indictment. On the first indictment was indorsed the fact that it was superseded, and on the second an indorsement was also made that it superseded the one filed June 17, 1901. The defendant also demurred to the second indictment, and the demurrer was overruled, and the defendant put upon trial. No decision was ever made upon the demurrer to the first indictment, and upon the trial under the second the defense is advanced that the pendency of an issue of law raised upon the first indictment precludes the attachment of jurisdiction under the second indictment, and that the first indictment could not be superseded, under the provisions of the Code of Criminal Procedure, and that the defendant could not be reindicted until the first demurrer had been disposed of, and then only (if the demurrer were sustained) in the event of the court permitting a resubmission to the grand jury to be made.

That the Code of Criminal Procedure applies to all proceedings in criminal actions from the time it took effect is manifest; that it furnishes exclusive rules of procedure for all cases, and in all stages of criminal actions and proceedings falling within its provisions, needs no argument; but that such provisions cover conditions and situations not expressly or impliedly within it is not a tenable proposition. Nowhere in that Code is reference made to the supersession of one indictment by another found by the same grand jury at the same term or otherwise, and yet a statute has been in existence for more than 70 years, and is still in existence, which provides that:

"If there be at any time pending against the same defendant two indict-
ments for the same offense or two indictments for the same matter, although
charged as different offenses, the indictment first found shall be deemed to
be superseded by such second indictment and shall be quashed."

When, in 1886, the legislature undertook the task of searching
the great body of the statutory law of the state, to winnow it and
declare what enactments were no longer in force, it specifically ex-
cepted from the repealing act passed June 5, 1886 (chapter 593,
Laws 1886), the provision of section 42 of article 2 of title 4 of the
fourth part of the Revised Statutes; being that above quoted, con-
cerning the superseding of one indictment by another. Obviously,
this section of the Revised Statutes was retained as part of the
body of the law, because no provision had been made in the Code
of Criminal Procedure for such a case. Its retention necessarily
recognized that one indictment may be superseded by another, and
it was enacted simply to regulate a rule of the common law. We
are not without information that such was the object of that stat-
ute. In People v. Monroe Oyer and Terminer, 20 Wend. 110, Judge
Cowen refers to it as being a singular statute, and states that why
it should have been passed in regard to a matter which stood upon
a much better footing at the common law, it is difficult to con-
ceive. What the footing of the rule at the common law was, is re-
ferred to in the proceedings against Sratton and others for deposing
Lord Piggott (21 How. St. Tr. 1048), where the solicitor general
moved to quash an information because the crown might go on to
trial and judgment on a new information, notwithstanding the pend-
ency of a former one; stating that, on all indictments or informa-
tions for crimes, the pendency of another prosecution for the same
offense cannot be pleaded, as.it may be upon informations for pen-
alties. In Hawk. P. C. bk. 2, c. 34, § 1, it is said that another
prosecution depending is not a good plea to an indictment. In the
Matter of Stratton, the court refused to quash because the attorney
general had it in his power, by entering a nol pros., to dispose of
the information; and that was the condition at the common law
referred to by Judge Cowen in the case above cited. The amend-
ment of the common law by the section of the Revised Statutes
above quoted consists in the provision that the first indictment must
be quashed. That section declares a positive rule of law, which
permits of the supersession of one indictment by another by direc-
tion of the court; for, under the case of People v. Monroe Oyer
and Terminer, the action of the court is required before the first
indictment may be suppressed. The indorsements upon the indict-
ments in this case are part of the record before us, and, in the ab-
sence of anything to show to the contrary, we must presume that
the first indictment was, in substance, quashed by being superseded
by order of the court, and not by the act of unauthorized officials
or other persons. Here, then, is a positive rule of law, which is
sought to be limited by some construction which it is supposed
will harmonize it with the provisions of the Code of Criminal Pro-
cedure. There is nothing in that Code to limit the operation of the
rule as one of the common law, modified by the Revised Statutes.

It should be given the same effect now as heretofore. If, instead of maintaining section 42 in force as part of the Revised Statutes, that section had been inserted literally in the Code of Criminal Procedure, would the result in any way have been different? No provision of that Code is pointed out which would qualify the rule. It would still be an independent provision for getting rid of an indictment defective or insufficient, or not meeting the requirements of a particular offense. The construction could not be reasonably given that by the simple interposition of a demurrer all authority to supersede an indictment should at once end, and the power to reindict depend entirely upon the discretion of the judge if he sustained the indictment. The provisions of the Code of Criminal Procedure relating to demurrers govern and control in cases of indictments remaining uncanceled and of record, not to those quashed and superseded by an independent provision of law. No question is involved here of the defendant being twice put in jeopardy. A demurrer is not a plea (section 231, Code Cr. Proc.), and the defendant was never put upon trial, nor did he incur the peril of a verdict, on the first indictment.

2. We are further asked to reverse the judgment and set aside the verdict on the ground of the abuse of counsel for the prosecution in statements made in opening the case and in summing up to the jury, and for the reason that such statements related to matters outside and irrelevant to the issues, and "were calculated to intimidate and coerce the jury, through threats, and by appeals to their fears and public opinion, were not rebuked by the judge, nor their continuance stopped, when objected to by the defendant, and they constitute an invasion of the defendant's right to a fair and proper trial." It is not necessary to repeat the remarks. They are set forth in the opinion of Mr. Justice McLAUGHLIN. The recorder is now put on trial, but I am unable to perceive that he failed in his duty to the defendant. Concerning the speeches or remarks of counsel, our attention is called again, as is becoming quite the fashion, to People v. Mull, 167 N. Y. 247, 60 N. E. 629; People v. Fielding, 158 N. Y. 542, 53 N. E. 497, 46 L. R. A. 641, 70 Am. St. Rep. 495; People v. Watkins, 23 App. Div. 253, 48 N. Y. Supp. 856. Whatever may be drawn from these cases by way of instruction upon the subject of the duty of counsel in addressing juries, neither they nor any other cases warrant the deduction that a verdict solemnly rendered on competent and convincing evidence must be set aside because, under pressure of great excitement, counsel make statements which by their very extravagance are rendered harmless. What right have we to assume that a special jury, drawn from a selected number of the most intelligent members of a metropolitan community, and who have answered the requirements of sections 7, 8, c. 378, Laws 1896, would be recreant to their duty, and coerced or induced to violate their oaths by the tumid style and overshot declaration of counsel in argument, even if, in unguarded moments, these blemishes should be introduced in an address by so very able and accomplished a lawyer as the prosecutor in this case? What was said by counsel, and is objected to here,

was calculated rather to repel the jurors, and prejudice them against the speaker, than otherwise. I have no criticism to make of the action of learned courts in setting aside verdicts because of the intemperate language used and prejudicial statements deliberately made by prosecuting counsel, manifestly injurious to a defendant, and which may have been influential with the jury. The underlying inducement to such action has always been the conviction of the court that, under the circumstances of each case, the nature of the charge, the character of the evidence, and the atmosphere of the trial, so far as that could be reproduced, the remarks of counsel were such that average men must or may have been affected by them, and thus influenced to render a verdict. In reaching their conclusion, courts so dealing with verdicts act altogether upon their own impressions. I have not been able to discover a single case in which the deliberate finding of a jury has been repudiated and nullified where the remarks of counsel have been of such an exaggerated and excessive character that they ought not to influence a jury of weaklings. This defendant was not tried before such a jury, but one impaneled from the special jury list of the county. I cannot believe otherwise than that the remarks of counsel objected to in this case could have had no more effect upon such a jury than the idle wind.

3. The contention is further made by the appellant that prejudicial error was committed by the trial court in its refusal to strike out the testimony of the witness Nettie Drexler. This woman testified that she overheard a conversation which took place between the defendant and Lena Schmidt, relating to the defendant's conduct in making raids upon the house kept by the latter, turning the inmates out, and otherwise molesting and maltreating them, after he had been paid, as the prosecution claims, to protect them. This witness swears that she heard Mrs. Schmidt say to the defendant: "Why did you do this? You had the money, and now you are chasing out the girls." The witness Drexler was then asked: "What did you hear Bissert say, if anything? A. I did not hear what answer he gave." Thereupon the defendant's counsel moved to strike out the testimony of this witness. The object of introducing this testimony, undoubtedly, was to show that the defendant acquiesced in the statement made by Mrs. Schmidt in the conversation testified to. The defendant claims that the fair construction of the answer of the witness is that something was said by the defendant in reply to Mrs. Schmidt, while the prosecution claims that her answer is susceptible of the construction that the defendant made no reply. I think this testimony should have been stricken out, but the question remains whether it really could have had any effect upon the jury, or whether it was of such importance that a verdict found upon other and independent evidence, sufficient to establish the charge, should be set aside. That it was not regarded as of any consequence by the defense, the prosecution, or the court, seems to be a fair conclusion from reading the record of the subsequent stages of the trial. We have in the record, in full, the addresses to the jury of the defendant's counsel, the counsel for

the prosecution, and also the judge's charge. No reference whatever—even the slightest—is made to the testimony of the woman Drexler in these addresses or in the charge. It was entirely ignored. The verdict was evidently found upon the testimony of Lena Schmidt and of another witness, who is not referred to in the opinion of Mr. Justice McLAUGHLIN, but who furnished corroboration of the witness Schmidt, which the court instructed the jury was required to authorize a conviction. The witness Rosie Greenberg, called by the prosecution, testified that she saw the money given as a bribe actually handed by Lena Schmidt to the defendant. She swears to the conversation had between the defendant and Schmidt in the front room of Schmidt's house, and that the defendant said he had seen the police captain, and that everything was all right; that Schmidt asked him how many girls he would allow her to keep, to which he replied, "Five or six;" and that she saw Schmidt hand the defendant, Bissert, a roll of money. That was independent corroboration; the testimony coming, it is true, from a contaminated source, for this witness was one of the inmates of the Schmidt den. But her credibility was for the jury. We are referred to what was said by the court of appeals in Moller v. Moller, 115 N. Y. 466, 22 N. E. 169, as to the evidence of a prostitute, or one of admittedly low and depraved character, requiring corroboration; but in Winston v. Winston, 165 N. Y. 556, 59 N. E. 273, commenting upon the Moller Case, the court said that in that case it did not intend to hold that corroboration of a prostitute's testimony was a rule of evidence, but one for the guidance of judges. In his charge to the jury in the case now before us, the recorder accepted that guidance, and very carefully instructed the jury, quite to the satisfaction of the defendant's counsel (for there was no exception to the charge, and no request was made for further instructions), in the following words:

"The testimony of prostitutes, as a general thing, should be very closely scrutinized and weighed by a jury; and a conviction should never be had upon the testimony of prostitutes unless such testimony conforms to the circumstances happening at or about the time, and impresses the jury with the inherent truth of the story."

In the same connection the court quoted the language of the Presiding Justice of this court in Re Cross, 85 Hun, 357, 32 N. Y. Supp. 942, as follows:

"It is undoubtedly true that much of the evidence upon which we must rely, if crime is to be punished, comes from polluted sources. Crime is not committed ordinarily with respectable and reputable witnesses looking on, who can testify to the facts, but it has its birth largely in secret, and amongst the disreputable; and the fact of its commission must be established, if at all, by proof taken from this class of the community. These facts should be no reason for allowing crime to go unpunished. It necessitates, however, a closer examination of the evidence, and some corroboration of the witnesses, either from the nature of the testimony given, or by the testimony of other witnesses. If the story of such a witness is of such a character, and consistent in its details, and harmonizes so well with surrounding circumstances, as to carry conviction, even where there is no corroborative testimony, it may afford satisfactory proof of guilt. But if such evidence is not consistent, abounds in contradictions, and shows a disregard of the truth, clearly it cannot form the basis of a judgment establishing guilt."

Other grounds for reversing this judgment are urged upon us very strenuously by the learned counsel for the appellant. They are not referred to in the opinion of Mr. Justice McLAUGHLIN, but one or two of them should receive some notice.

4. It is claimed by the appellant that there was a fatal variance between the indictment and the proof. It is charged in the indictment that the offense with which the defendant was charged was committed on October 15, 1900, while the proof shows that the alleged crime was actually committed on the 29th of September, 1900. Upon this appearing on the trial, the defendant sought to take advantage of it in a perfectly legitimate way; but the variance was not material in this case, for the allegation of time in an indictment, unless such time is of the essence of the offense, need not be proved as laid in the indictment. Such was the rule at common law, even in cases of high treason. Sir Henry Vane's Case, 6 How. St. Tr. 131. That rule has been followed in People v. Formosa, 131 N. Y. 478, 30 N. E. 492, 27 Am. St. Rep. 612; People v. Willis, 158 N. Y. 392, 53 N. E. 29; People v. Emerson, 53 Hun, 437, 6 N. Y. Supp. 274; People v. Jackson, 111 N. Y. 363, 19 N. E. 54; and other cases. And section 280 of the Criminal Code provides that the precise time at which the crime was committed need not be stated in the indictment, but it may allege it to have been committed at any time before the finding thereof, "except where time is a material ingredient of the crime."

5. It is also urged by the appellant that the second indictment was improperly found, because witnesses were not re-examined by the grand jury. If a second indictment might be found at all, it was not necessary to re-examine the witnesses. "The grand jury at any time during its term of organization and service—even at a subsequent term of the court—may find a second indictment as a substitute for the first, without hearing the evidence anew." 1 Bish. Cr. Law, 870. Where a bill has been withdrawn or quashed, a new bill may be found as a substitute by the grand jury without examining witnesses. Whart. Cr. Prac. § 365. I find nothing in the Code of Criminal Procedure which, if I am right in the conclusion that a second indictment may be found to supersede the first, requires the grand jury to examine anew the witnesses upon whose testimony or statements the first indictment was found.

6. The principal witness for the prosecution to prove the crime laid in the indictment was one Lena Schmidt. She testified that on a certain day she paid a certain sum of money to the defendant for what is called "police protection" in conducting and maintaining a house of prostitution. The prosecution was allowed to prove that, on a date a few days preceding that upon which the alleged payment to the defendant was made, this witness drew from a savings bank a sum of money. This was testified to by an officer of the bank in which Lena Schmidt kept her account. That proof was undoubtedly considered material, as showing that the witness Schmidt was possessed of money, and the source from which she obtained it. I do not think it was material evidence, but at the same time it was not of such a character as would affect the merits of the case. It was

entirely immaterial where she got the money, if it was actually paid to the defendant. The point in issue was whether money was paid. That was to be proven to the satisfaction of the jury, beyond a reasonable doubt. If the proof were sufficient to establish that fact beyond a reasonable doubt, then the evidence as to the source from which the money was obtained could not have any influence upon the verdict. And the same considerations are applicable to proof allowed of Lena Schmidt buying furniture for the house she kept and maintained for unlawful purposes. The admission of these matters in evidence may constitute technical errors, but, to my apprehension, they are not sufficient to reverse the judgment, because they were not prejudicial. Section 542, Code Cr. Proc.

Various circumstances and details scattered through the record, to which it is not necessary now to refer, come in aid of the truth of the testimony of the chief witnesses for the prosecution. It is not required that special reference should be made to any other of the arguments advanced by the appellant for the reversal of this judgment. I think the defendant was properly convicted on the evidence, and that the judgment should be affirmed.

O'BRIEN, J., concurs.