## Court of Appeals.

June 4, 1901.

## THE PEOPLE v. ARCHIE MULL

### (167 N. Y. 247.)

MURDER—TRIAL—REMARKS OF DISTRICT ATTORNEY TO JURY.

> Where, on a trial for murder, it is a matter of reasonable doubt whether the district attorney by his remarks to the jury did not intimidate them or coerce them through threats and an appeal to their fears, in case of an acquittal, into finding a verdict against the defendant and thus make it reasonably doubtful whether the defendant has had a fair trial, the judgment of conviction should be reversed.

APPEAL from a judgment of the supreme court, rendered at a trial term for the county of Rensselaer January 26, 1900, upon a verdict convicting the defendant of murder in the first degree.

The facts, so far as material, are stated in the opinion.

Jeremiah K. Long and George J. McDonnell for appellant.

W. O. Howard, for respondent.

LANDON, J.—We have carefully examined this record and the exceptions. The evidence we think is ample to sustain the verdict, and the exceptions other than those taken in behalf of the defendant to portions of the closing address to

the jury made by the district attorney, do not, we think, require a reversal. The question presented by these exceptions is, whether the district attorney by his remarks to the jury did not intimidate them, or coerce them through threats and an appeal to their fears, in case of an acquittal, into finding a verdict against the defendant, or at least make it a matter of reasonable doubt whether he did not, and thus make it reasonably doubtful whether the defendant has had a fair trial, or has been fairly convicted by the jury.

In considering the remarks of the district attorney, to which exceptions were taken, it is proper to state that it appeared upon the trial that the defendant had been brought to trial before a jury at a trial term in Rensselaer county the previous month upon the same indictment, and that the jury had disagreed and been discharged. Upon this trial, after the jury had been impanelled and sworn and some testimony on the part of the People had been received, the counsel for the defendant and the district attorney privately conferred together respecting " rumors that attempts had been made on the part of some person or persons to approach and bribe jurors " on the present panel. They then conferred with the presiding judge, and he advised that what they had said to him privately they should say publicly. The district attorney then publicly asked the court that in giving the jury the usual caution he should request that if any one should approach any of them concerning this case to report it to the court. The district attorney added: " I would not ask it if I did not have very good evidence that it has already been done. * * * I think one of the jurors now on the panel is aware of it." The counsel for the defendant joined in the request and stated that no such thing had been done on the part of the defense so far as he knew.

THE DISTRICT ATTORNEY: " It has been done and the party represented the defendant, or claimed to represent the defendant. He offered a person $300 to vote in his favor. I have very good evidence of it and I don't want it tolerated,

and I think at least one of the jurors on this panel is aware of that condition of affairs."

Further remarks were made by the respective counsel to the effect that the jurors, if any such attempt should be made, should report it to the court.

The court thereupon so instructed the jury, adding some appropriate remarks, and closing by telling them that what had been said was not evidence in the case, and should in no way affect the final verdict. Nothing further was said about the matter in the presence of the jury, unless the following closing remarks of the district attorney had reference to it:

" Why, this does not seem to me to be the trial of Archie Mull. He has been tried and convicted in the minds of everybody who has heard this testimony. No other person has been accused or suspected, directly or indirectly, of the commission of this atrocious crime. There is no doubt of his guilt. No one of the men who sit before me in those chairs has a doubt, either reasonable or unreasonable, as to who committed this atrocious, fiendish crime. A failure by you, gentlemen, to convict this man of this crime which has been so clearly proven against him, cannot fail to excite widespread comment and indignation among the whole body of citizens of this county.

" Of course it is always the hope of a man accused of murder in the first degree to find one juryman to stick out and bring about a disagreement to save his life. I know that. I know that is the only hope of this accused, but if there is a man before (among) you who will be so callous to public opinion and to the respect of his fellow-citizens, who would be so forgetful and reckless of his oath, so negligent and heedless of the welfare of his family, as to say that Archie Mull did not commit this crime, then I am deceived.

" Now I have made considerable and extensive inquiry, carefully, at a considerable expense, from a great number of your neighbors concerning each one of you that sits there. You probably observed that I had a little history here of each

one of you. I know a good deal more about you than you think I do concerning your habits and your characteristics, and your reputation in the community in which you live. And this is concerning every man who sits in these chairs. I could not let any other person sit. It has been reported to me that you are very decent, square, upright, honest men. And if there is a man that sits in those chairs that is willing to brand himself with suspicion by saying that Archie Mull did not commit this crime, my judgment of his character is not at all correct.

"It seems strange in a community that three hundred men should be called to come here from all the various departments of domestic and business life, to pass upon the guilt or innocence of this man, were it not in this county where there seems to be a growing sentiment on the part of jurors to be lax in the enforcement of the law; were it not for that fact a jury could be secured from the ordinary panel, and try this plain and simple case; but when it reaches a point that another list from this county must also be exhausted to convict a man of crime so atrocious, so wicked, so wanton, so unparalleled and so unheard-of in all the history of crime as this, where there is no defense, it is strange. And in this case there is no doubt. You are not asked to rely on circumstantial evidence, but it is one where an eye-witness comes and carefully tells you who committed the horrible and cruel killing. It is no wonder that your neighbors have concluded that the integrity and decency of this panel of jurors, instead of Archie Mull, is on trial here to-day. Don't let it be said, don't let it be said, I beseech you, that twelve honest men cannot be found within the borders of Rensselaer county; don't let it be said of you that, from all the integrity and virtue and respectability of this great county, twelve men cannot be gotten together who will do justice. A failure to convict in this case, where there is no defense and where there is no doubt, cannot fail to create again another epidemic of murder in this county. It cannot fail to bring within our borders hordes of despera-

does and criminals, who rely upon the puerile inefficiency and weakness of jurors here, and will select this as a safe field in which to operate. The consequences of your failure to convict in this case, in my judgment, cannot be weighed or gauged or measured at all. How could a more brutal, wanton and pathetic tragedy be committed than this?

"A double murder this was, gentlemen, in purpose and intent, if not in fact. Of course Arthur Snyder survived, not through the mercy of Mull, but of God. It seems to me to have been the purpose of the Almighty, in his stern and inscrutable justice, to have saved the life of this boy to tell you who perpetrated this fiendish and unholy deed. But for this miraculous and almost divine rescue of this eye-witness from the very jaws of death, there might be a failure of justice; but a failure by you now to convict and punish the murderer would seem to me to be a mimicry and mockery against God. It seems to me that this witness' life was preserved for the purpose of telling you who committed the crime, in order that this perpetrator might be punished. Now can you forget these scenes? Can you disassociate them from your mind? Are they not a part of this brutal tragedy, and can you, if you try, exclude them from your deliberations? Can Archie Mull forget them? Can he forget the piteous words of little Arthur Snyder, as he said, ' Poor old Mr. Lord is dying?' Can he forget his suppliant attitude, begging for mercy, as he was being attacked, or his piteous words and groans as he laid there upon the ground?

"His demeanor in Court bears out the truth of the people's witnesses, and shows that he is guilty. It is what you ought to do; it is what you are expected to do."

Mr. LONG, of counsel for defendant: "We desire to except to that portion of the district attorney's remarks, where he said, substantially, at great time and expense, he had obtained from their friends' and neighbors the history of their lives, referring to the jurors' lives, or that in effect.

" Also as to what he said about the jury list being upon trial, or the jurors.

" And also to what he said that it should not be said in this county that twelve men should be found in this county that would not convict, and we ask to take it upon the record that the district attorney in his address to the jury has insisted upon the guilt of this defendant, on the theory that the alleged crime was committed with deliberation and premeditation, and has also insisted upon the crime of murder in the first degree having been committed by the defendant, while engaged in committing a felony upon the person of the deceased, to wit: The crime of robbery in the first degree; under the circumstances alleged in the third count."

THE COURT: " The district attorney's address has not been taken down by the stenographer. How can you get an exception to something that is not on the record? "

Mr. FURSMAN: " A portion of it was taken down, when requested."

THE COURT: " Some portion of it was taken down."

Mr. FURSMAN: " That portion was taken down mostly covering the exceptions."

THE COURT: " Some portion was taken down, and to such portion as was taken down, if your exceptions apply, they can be noted, but not of course to the portion that was not taken down. You cannot except to what is not on record."

Mr. LONG: " We desire to except to your Honor's ruling, that what we desire to except to, to what he said, cannot be excepted to."

THE COURT: " I say, that statement of what he said, such portion as is on the record, if your request applies to that, or exception, you can except to it, but you cannot except to something not on the record."

In People v. Fielding, 158 N. Y. 542, this court expressed its condemnation of the remarks made by a district attorney in summing up to the jury, and reversed the conviction because they exceeded in vituperation and unsupported prejudicial

statement the just privilege of the district attorney and invaded the right of the defendant to a fair and impartial trial. The case was carefully considered, and the law as there announced, both in the prevailing and dissenting opinions, requires the like condemnation of the no less offensive remarks of the district attorney in this capital case.

It is difficult, as we said in People v. Smith, 162 N. Y. 531, to lay down an inflexible rule applicable to such cases. The trial by jury aims to secure popular justice regulated by law. The rules respecting the admission of evidence suffice to protect the defendant from prejudice by irrelevant and hearsay testimony, and declarations unsupported by evidence. It is the right of the People no less than of the accused to address the jury upon every matter legitimately bearing upon the case. The general rule is that each party must keep within the evidence. But the evidence may be examined, collated, sifted and treated in his own way. Whatever of argument, suggestion or inference can be constructed or deduced from it in support of guilt, upon the one hand, or of inconsistency, confusion, doubt and uncertainty in support of innocence, upon the other, is permissible, and may be presented with ingenuity, persuasion, vehemence, fervor and effectiveness.

It is to a jury of the people that this address is made. They are the arbiters of the defendant's fate, and they are presumed to be the better qualified for their duty after they have considered every phase of the case which the interest and earnestness of the contestants present. It is the verdict of laymen that is sought, not of the professional legist. The system of trial by jury has its support and probably its perpetuity, in the popular favor. The eloquence of the criminal bar shares the same favor and has received the popular applause for many ages.

It must be conceded, however, that this privilege and practice of counsel exposes jurors to the sway of their emotions when their reason and judgment should be calmest and best, and that a miscarriage of justice may result. The courts,

impressed with the right of both parties to be fully heard, and with the supremacy of the jury in the decision of issues of fact, have been reluctant to interfere. The learned and impartial judge who presided over this trial no doubt shared this reluctance.

But it is nevertheless true that the verdict should be impartial and be pronounced upon the evidence and according to the evidence. It follows that the address of counsel must be upon the evidence and according to the evidence.

It is greatly to be feared that the remarks of the district attorney, in view of the former disagreement of a jury, and the positive though unproven assertions of the district attorney during the episode upon bribery, intimidated the jury. Why should a failure to convict excite widespread indignation? And upon whom would it fall? What juror was willing to be thought callous to public opinion, the respect of his fellow-citizens, reckless of his oath, heedless of the welfare of his family, willing to brand himself with suspicion, unwilling to do justice, and willing to acquit such a murderer whose guilt had been made clear by the testimony of an eye-witness, seemingly saved from death by a miraculous and almost divine rescue, according to the purpose of the Almighty, in order to prevent a failure of justice? Clearly, we ought not to allow a verdict to stand to the securing of which such methods and influences were thought by the public prosecutor to be necessary.

If it be said that in the case before us there is no reasonable doubt of the defendant's guilt, it should be remembered that it is not for the courts but for the jury to say this by their free and impartial verdict, and we cannot know that they have said it when we do know that they were told by the district attorney, and his statement was enforced by his previous declarations of attempts at bribery and his precautions against their success, that their own good repute was in jeopardy and could only be saved by convicting the defendant.

We do not mean to say that such remarks of counsel are

not within the power of the court to cure either by prompt rebuke, or by instructing the jury, to disregard them, or, better, by both methods. In most cases no doubt it can be done. The difficulty here is that the remarks of counsel passed without rebuke or dissent from the court, notwithstanding the objection of the defendant's counsel, and thus apparently received the sanction of the court instead of its severe condemnation.

The judgment and conviction should be reversed and a new trial granted.

PARKER, Ch. J., O'BRIEN, BARTLETT, MARTIN, VANN and CULLEN, JJ., concur.

Judgment reversed, etc.