PEOPLE v. DOODY.

(Supreme Court, Appellate Division, Third Department.   May 23, 1902.)

1. PERJURY—MATERIALITY OF TESTIMONY.
        On a prosecution of a deputy commissioner of city works for con-
        niving at the audit and allowance of fraudulent claims against the city
        with intent to defraud, wherein the frauds charged consisted of the
        awarding of contracts for public improvements pursuant to a fraudulent
        arrangement with a certain contractor, whereby the contractor was to
        pay defendant a percentage on the contracts awarded him, the testimony
        of such contractor that he had furnished defendant with the names of
        men who would bid for the contracts as his representatives, and that
        he paid defendant the percentage agreed upon out of the proceeds of

the contracts awarded him, was upon matters material to the prosecution, within the meaning of Pen. Code, § 96, providing that one who willfully and knowingly testifies on oath as to any material matter shall be guilty of perjury.

2. SAME—TESTIMONY AS TO MEMORY OF MATERIAL MATTERS.

Where a witness on a criminal prosecution knows and remembers what occurred between himself and defendant in connection with the crime charged, and such occurrences are material to the determination of defendant's guilt or innocence, the false testimony of such witness that he does not remember such occurrences is perjury, within Pen. Code, § 96, providing that any one who willfully and knowingly testifies falsely in any material matter, or states in his testimony that any material matter is true which he knows to be false, shall be guilty of perjury.

3. SAME—PROSECUTION—CIRCUMSTANTIAL EVIDENCE—SUFFICIENCY WITHOUT DIRECT TESTIMONY—FORMER TESTIMONY—CONTRADICTORY STATEMENTS.

On a prosecution for perjury by a witness in the second trial of a criminal case, in testifying that he did not remember certain transactions as to which he had given positive testimony on the former trial, evidence consisting of copies of the witness' testimony on the first and second trials, and of his positive testimony on the trials of two other participants in the transactions as to which the alleged false testimony was given, and of affirmative recitals of the circumstances made by the witness to the district attorney prior and subsequent to the trial in which the alleged perjury was committed, was sufficient to take the case to the jury, though no witness testified directly as to the falsity of the witness' testimony.

4. SAME—CAPACITY TO REMEMBER—ADMISSIBILITY OF EVIDENCE—EVIDENCE INVOLVING OTHER CRIMES.

On the first trial of a criminal case, a contractor testified that defendant and other public officers were all engaged with him in a scheme to defraud the public, and that, pursuant to their arrangements, he had to pay defendant and the others a percentage on all contracts awarded him, amounting in all to 40 per cent. All the transactions were closely related, and the contractor described them in detail before the grand jury and on such first trial. On a second trial of such officer, the contractor testified that he did not remember anything about a certain one of the contracts as to which he had previously given positive testimony, and subsequently he was prosecuted for perjury in the second trial; his sole defense being that his mind had become so impaired by disease that he was incapable of remembering anything. Held, that the contractor's former testimony as to all the transactions and contracts entered into pursuant to the scheme to defraud was admissible as bearing upon his capacity to remember the particular circumstances in regard to which the alleged perjury was committed, and upon whether his testimony on the second trial was knowingly false, though such evidence involved defendant's connection with other independent crimes.

Fursman, J., dissenting.

Appeal from Kings county court.

Daniel Doody was convicted of perjury, and he appeals. Affirmed. See 69 N. Y. Supp. 724.

In 1896 and 1897 Theodore B. Willis was commissioner of city works in the city of Brooklyn; Robert W. Fielding was deputy commissioner of city works; William E. Phillips resided in Brooklyn, and was a brother-in-law of Theodore B. Willis; Oscar Knapp was a water purveyor; Frederick Milne was an engineer in the water purveyor's office; A. Lawrence Jensen was financial clerk in the comptroller's office; William H. Goff was a superintendent and inspector in the sewer department; Joseph R. Clark was a member of the board of aldermen; and William H. Leaycraft was a member of the common council. The defendant, Daniel Doody, has for many years

been engaged in contracting and building in the city of Brooklyn. In 1896 and 1897 Doody was in financial difficulties, and could not take contracts in his own name. During said two years contracts for public work were made with various employés of Doody, but which contracts were really for Doody; and there was paid by said city on said contracts, to persons so acting in the interest of Doody, about the sum of $200,000. On the 14th day of March, 1898, Doody, appeared before the grand jury of the county of Kings and gave evidence in regard to obtaining the said contracts in the name of his employés and in regard to making and carrying out corrupt bargains relating thereto with city officers and employés. The evidence of Doody before the grand jury was to the effect that the city works department not only divided some of the work to be done for the city into small parts for the purpose of giving it to him without advertising for bids, but corruptly aided him in such and other contracts, to fraudulently obtain a large amount of money from the city, and that the officers and employés named shared with him in the moneys so fraudulently obtained from the city. The result of the evidence so given by Doody before the grand jury was that Theodore B. Willis and William E. Phillips were indicted for conspiracy; Theodore B. Willis was indicted for perjury; Robert W. Fielding was indicted for conniving at the audit and allowance of a fraudulent claim against the city of Brooklyn, with intent to defraud; Oscar Knapp was indicted for the same offense; Frederick Milne was indicted for the same offense; Joseph R. Clark was indicted for unlawfully taking money for a vote and act in his official capacity as a member of the board of aldermen; William H. Goff was indicted for taking an unlawful fee for performing an official act; A. Lawrence Jensen was indicted for the same offense; William H. Leaycraft was indicted for unlawfully taking and receiving money as a consideration for a vote and act in his official capacity as a member of the common council; and other indictments were found against the said Fielding and the said Knapp. The defendant, in his testimony before the grand jury, stated with much detail that he gave to different persons in the city works department the names of various persons to whom contracts were to be let in his interest, that such persons with whom contracts were to be made would wholly represent him, and that they would not really have any interest therein. He further stated in substance that to enable him to get such contracts, and to facilitate the payment of the bills to be rendered therefor, he agreed to pay and did pay Robert W. Fielding 10 per cent. on each and every contract; that he agreed to pay and did pay Frederick Milne 10 per cent. on certain contracts; Oscar Knapp, 10 per cent. on certain contracts; William E. Phillips, 10 per cent. on certain contracts, and which he stated Theodore B. Willis was also interested; A. Lawrence Jensen, certain specific amounts for each warrant as to certain contracts, and 5 per cent. on certain other contracts; William H. Goff, $50 each and every week during the time he was doing work under him as superintendent; and to said Joseph R. Clark and said William H. Leaycraft, each, an amount on certain contracts as fully set forth in his evidence before the grand jury.

On the 16th day of May, 1898, Fielding was tried on one of the indictments against him; and on the trial Doody was sworn for the people, and testified to giving Fielding the names of persons who would bid on work for him, and that it was agreed between the said Fielding and himself that the contracts to be let to such persons would be the contracts of said Doody. He further testified on the trial to paying Fielding 10 per cent. on the contracts in the city works department which were given to the persons whose names had been so given to said Fielding, including the contract for repaving New Utrecht avenue, and that the 10 per cent. so paid said Fielding on that and other contracts was paid by him by placing the amount, in bills or specie, in a drawer of the desk of said Fielding while Fielding was alone with him in the room, and sitting at his desk. Fielding was found guilty under that indictment, and was sentenced to imprisonment. An appeal was taken from the judgment of conviction, which was unanimously affirmed by the appellate division. An appeal was then taken to the court of appeals. In the meantime one of the indictments against Theodore B. Willis and William E. Phillips so found by said grand jury was called for trial, and Doody

on said trial was called as a witness, and again swore to the arrangements made by him with Fielding, Phillips, and others, and to the payment of the percentages in pursuance of such agreements. Other trials were also had, and Doody repeated the testimony in regard to contracts and payments as already stated. The court of appeals reversed the judgment of conviction against said Fielding (People v. Fielding, 158 N. Y. 542, 53 N. E. 497, 46 L. R. A. 641, 70 Am. St. Rep. 495) on grounds not relating to the merits thereof, and ordered a new trial. Doody was informed by the district attorney that the court of appeals had reversed the Fielding Case, and Doody replied that it was the best news he had heard for a long time; that he felt like going out and getting drunk. He repeated this several times, and the district attorney said: "You sympathize with the defendant?" and he said: "Of course I do. I am sorry to see him convicted."

Fielding was again tried on the 19th day of December, 1899. Prior to that time the district attorney of Kings county had repeated interviews with Doody in preparation for the trial of the various cases, in which conversations Doody repeated to him the statements made by him before the grand jury. On or about the 16th day of December, 1899, the district attorney had another interview with Doody, and informed him that the case against Fielding was about to be tried, and that he (Doody) would be called as a witness. The material part of the testimony of the district attorney relating to such interview is as follows: "I reminded him of an interview we had previously had when he was in my office, when I received telegraphic news from the clerk of the court of appeals informing me of the result of the Fielding trial,—that the case was reversed,—and in which he expressed very great delight. To my surprise, reminding him of this, I told him I knew he sympathized with the defendant, but he would have to go upon the stand, and I wanted to refresh his memory as to the testimony he gave on previous occasions. He said he would be glad to have me read over portions of his testimony, and I read portions as given before the grand jury, as given in the previous Fielding trial and in the Willis trial,—particularly portions relating to his payments of money to Fielding; and I asked him, was that correct, and as he now recollected it, and he said it was. That substantially ended that conversation. I did not see him between this conversation and when I called him as a witness upstairs,—not after the last conversation, which I expected to be the last conversation before he went on the stand."

The second Fielding case was called for trial on the 19th day of December, 1899, and Doody was put on the stand as a witness, and testified as follows: "Q. What conversation did you have upon the subject with Mr. Fielding in reference to parties bidding on work as your representative? A. I don't remember any conversation I had with him on that subject. Q. You remember giving testimony in the Fielding trial heretofore? A. Yes, sir. * * * Q. Do you state that you do not remember having any conversation with him with regard to parties representing you, and bidding on work for the city? A. What do you wish me to say? Q. State whether you did have such a conversation? A. I don't remember any such conversation. Q. Did you tell Mr. Fielding the names of parties—state to him the names of parties—who would bid upon work as your representative? A. I do not remember having made such a statement to him at all. * * * Q. Did you pay Mr. Fielding any portion of the money for repaving over the water main on New Utrecht avenue? A. I don't remember that I did. * * * Q. Did you pay Mr. Fielding any portion of the money for repaving over the water main on New Utrecht avenue? A. I don't remember that I did. Q. Eh? A. I don't remember it. I have no recollection of paying him anything on it. * * * Q. Did you pay Mr. Fielding a portion of the money that you got from this New Utrecht avenue contract? A. I don't recollect having paid him anything on New Utrecht avenue. Q. I ask you now if you will state upon your oath that you did not pay Mr. Fielding part of the money that you got for repaving over the water main on New Utrecht avenue, on New Utrecht avenue contracts? A. I simply say I don't recollect having paid him anything on this bill. Q. What bill? A. New Utrecht avenue. Q. New Utrecht avenue what? Do you state upon your oath that you did not pay him any portion of the money received from that work? A. That is the best

76 N.Y.S.—39

answer I can give: I don't remember. Q. I ask you to answer whether you did or did not? I want an answer either that you did, or that you did not, or that you cannot remember. Q. I have said I don't remember. That is what I did say. Q. Will you swear that you did not? A. I simply swear that I do not remember. Q. Answer the question whether you did or not. That calls for an answer 'Yes' or 'No.' A. I don't remember. It is three or four years ago, and I don't recollect what transaction occurred at that time. * * * Q. You can answer that question. Will you swear that you did not pay him anything? A. The best answer I can give to that question is, I don't remember paying.him anything. Q. You must answer that question 'Yes' or 'No.' Will you swear that you did not? A. No, sir; I cannot swear that I did not. Q. Now I will ask you another question: Didn't you pay him ten per cent.? A. I don't remember having done so. Q. Can you swear that you did not? A. No, sir. Q. Have you not sworn under oath that you did? A. I don't remember. Q. Have you not stated under oath that you paid. Mr. Fielding ten per cent.? A. I don't recollect that I did. Q. Do you state that you did not? A. No, sir."

The jury acquitted Fielding. Thereafter, and on the 5th, 8th, 10th, and 12th days of January, 1900, Doody was at the district attorney's office, and talked about the several contracts mentioned in his evidence given before the grand jury, but stated that he had forgotten whether he paid any money to said Fielding and others. On the 17th day of January, 1900, the grand jury indicted Doody for the crime of perjury. The indictment of defendant states with particularity the indictment of Fielding, and includes therein a copy of the Fielding indictment, and then charges that on the trial of Fielding under that indictment "it then and there became and was material, among other things, upon the part of the prosecution in said action, to inquire as to certain relations said to have theretofore existed between one Daniel Doody and the said Robert W. Fielding, the defendant in said action, and to further inquire whether certain conversations had been theretofore had between the said Daniel Doody and the said Robert W. Fielding in reference to parties, as the representatives of said Daniel Doody, bidding on work then about to be let and contracted for by the city of Brooklyn, the said Robert W. Fielding being then and there a public officer, to wit, deputy commissioner of city works in and for said city of Brooklyn, a part of whose duty it was to take part in the examination and making of such contracts, and in the auditing and allowance of claims and demands upon said city of Brooklyn, as appears in the indictment hereinbefore set forth, and to further inquire whether the said Daniel Doody had theretofore, at some time prior to the filing of said indictment against the said Robert W. Fielding, told the said Robert W. Fielding the names of certain persons who would, as the representatives of said Daniel Doody, bid upon work and contracts to be given out and made on account of the city of Brooklyn by said Robert W. Fielding as such deputy commissioner of city works as aforesaid, and to further inquire whether he, the said Daniel Doody, had at some time prior to the filing of said indictment paid to the said Robert W. Fielding any portion of the money received by said Daniel Doody from the city of Brooklyn in payment of a claim of his, the said Daniel Doody's, against the city of Brooklyn, for repaving over the water main on New Utrecht avenue, in the city of Brooklyn." The indictment then sets forth the trial of said Fielding, and that said Doody appeared on said trial as a witness, and was duly sworn, and further charges: "And did then and there, being so sworn, falsely, feloniously, willfully, and knowingly say and testify, among other things, in substance, that he, the said Daniel Doody, did not then and there remember that he, the said Daniel Doody, had theretofore had any conversation with the said Robert W. Fielding in reference to parties bidding on work for and in the city of Brooklyn as the representatives of said Daniel Doody, and, being so sworn as aforesaid, the said Daniel Doody did further then and there falsely, willfully, knowingly, and feloniously, say and testify, in substance, that he, the said Daniel Doody, did not then and there remember that he, the said Daniel Doody, had at any time theretofore told said Robert W. Fielding the names of parties and persons who would, as the representatives of said Daniel Doody, bid upon work and contracts to be given out and

made on account of the city of Brooklyn by said Robert W. Fielding as such deputy commissioner of city works as aforesaid; and the said Daniel Doody, being so duly sworn as aforesaid, did then and there further falsely, willfully, knowingly, and feloniously say and testify, in substance, that he, the said Daniel Doody, did not then and there remember that he, the said Daniel Doody, had at any time prior to the filing of said indictment paid to the said Robert W. Fielding any portion of the money received by him, the said Daniel Doody, from the city of Brooklyn in payment of a claim of his, the said Daniel Doody's, against the city of Brooklyn, for repaving over the water main on New Utrecht avenue, in the city of Brooklyn, and that he, the said Daniel Doody, did not then and there remember whether he had or had not paid any portion of such money to him, the said Robert W. Fielding. Whereas, in truth and in fact, he, the said Daniel Doody, then and there well knew and remembered whether he, the said Daniel Doody, had or had not theretofore had a conversation and divers conversations with the said Robert W. Fielding in reference to parties bidding on work for and in the city of Brooklyn as the representatives of the said Daniel Doody. And whereas, in truth and in fact, he, the said Daniel Doody, then and there well knew and remembered that he, the said Daniel Doody, had theretofore had a conversation and divers conversations with the said Robert W. Fielding in reference to parties bidding on work for and in the city of Brooklyn as the representatives of said Daniel Doody. And whereas, in truth and in fact, he, the said Daniel Doody, then and there well knew and remembered whether he, said Daniel Doody, had or had not told the said Robert W. Fielding the names of parties and persons who would, as representatives of him, the said Daniel Doody, bid upon work and contracts to be given out and made for and on account of the city of Brooklyn by said Robert W. Fielding as such deputy commissioner of city works as aforesaid. And whereas, in truth and in fact, the said Daniel Doody then and there well knew and remembered that he, the said Daniel Doody, had told the said Robert W. Fielding the names of parties and persons who would, as representatives of him, the said Daniel Doody, bid upon work and contracts to be given out and made for and on account of the city of Brooklyn by said Robert W. Fielding as such deputy commissioner of city works as aforesaid. And whereas, in truth and in fact, the said Daniel Doody then and there well knew and remembered whether he, the said Daniel Doody, had or had not at some time prior to the filing of said indictment paid to the said Robert W. Fielding a portion of the said money received by him, the said Daniel Doody, from the city of Brooklyn in payment of a claim of his, the said Daniel Doody's, against the city of Brooklyn, for repaving over the water main on New Utrecht avenue, in the city of Brooklyn. And whereas, in truth and in fact, the said Daniel Doody then and there well knew and remembered that he, the said Daniel Doody, had at some time prior to the filing of said indictment paid to the said Robert W. Fielding a portion of the said money received by him, the said Daniel Doody, from the city of Brooklyn in payment of a claim of his, the said Daniel Doody's, against the city of Brooklyn for repaving over the water main on New Utrecht avenue, in the city of Brooklyn. And whereas, in truth and in fact, the testimony so given as aforesaid by him, the said Daniel Doody, on the day and year aforesaid, at the borough, city, and county aforesaid, was in all respects willfully and knowingly false, perjured, and untrue. And whereas, in truth and in fact, the said Daniel Doody on the nineteenth day of December, 1899, and at all other days and times, well knew that the testimony aforesaid so given by him, the said Daniel Doody, upon said trial as aforesaid, and so sworn to by him as aforesaid, was in all respects willfully false, untrue, and perjured."

The trial of the indictment against the defendant Doody came on to be heard in the supreme court on the 10th day of December, 1900, and on such trial the people offered in evidence a copy of the testimony of Doody before the grand jury, copy of the testimony of Doody on the first trial of Fielding, a copy of the testimony of Doody on the said trial of Willis and Phillips, evidence of the statements made by Doody to the district attorney prior to the second trial of Fielding, a copy of the testimony of Doody on the second trial

of Fielding, the statements of Doody to the district attorney subsequent to the second trial of Fielding, and evidence of the statements made by Doody to the former district attorney of the county of Kings, and then rested. The defendant produced members of his family, employés, and associates to testify to acts and conversations of the defendant occurring a short time previous to his trial; also several experts who testified, in substance, that Doody was suffering from paresis. The people then produced witnesses to rebut the evidence as to the condition of the defendant's mind and memory, and an expert who testified that the defendant was not suffering from paresis, and that the alleged evidences of such disease were the results of the defendant's shamming. The case was then submitted to the jury, who found the defendant guilty as charged in the indictment. From the judgment of conviction, this appeal was taken.

Argued before PARKER, P. J., and KELLOGG, SMITH, CHASE, and FURSMAN, JJ.

Jerry A. Wernberg, for appellant.
John F. Clarke, Dist. Atty. (Martin W. Littleton, of counsel), for the People.

CHASE, J. The statutory definition of "perjury," so far as it relates to this case, is:

"A person who swears * * * that he will truly testify * * * on any occasion in which an oath is required by law or is necessary for the prosecution or defense of a private right or for the ends of public justice or may lawfully be administered, and who in such action * * * willfully and knowingly testifies * * * falsely in any material matter or states in his testimony * * * any material matter to be true which he knows to be false, is guilty of perjury."

On the Fielding trial, when it is claimed that Doody committed perjury, it was not only material, but necessary, for the people to show that Doody had furnished Fielding, who was then deputy commissioner of city works, the names of men who would bid on public work as his representatives, but also that out of the moneys collected by Doody on the contract for repaving over the water main on New Utrecht avenue he paid to Fielding 10 per cent. of the amount of such contract. So far as appears, Doody was the only person other than Fielding, the defendant then on trial, who had direct personal knowledge as to whether such names had or had not been given by Doody to Fielding, and as to whether the corrupt payment had or had not been made as charged in the indictment. If Doody then had a personal recollection in regard to the matters about which he was interrogated, a truthful statement of such recollection was material in determining whether Fielding was guilty or not guilty of the charge against him. If Doody then well knew and remembered that he did not furnish to Fielding the names of persons who would bid upon work as his representatives, and that he did not pay 10 per cent. of the amount of said contract to Fielding, it was necessary for the ends of public justice that he should so testify, to the end that the defendant so unjustly charged with crime might be relieved therefrom, and from the danger of conviction on a false charge. If Doody then well knew and remembered that he did furnish Fielding the names of persons who would bid upon work as his representatives, and that he did pay 10 per cent. of the amount of said contract to Fielding, it was neces-

sary for the ends of public justice that he should so testify, to the end that the defendant so on trial should be convicted and punished. The statutes defining perjury, and providing the punishment therefor, are designed to prevent the failure of justice. When a person well knows and remembers what occurred in connection with an alleged criminal transaction, and the facts so well known and remembered by him are material in determining the guilt or innocence of a person accused, it is perjury, within section 96 of the Penal Code, to falsely testify that he does not remember what occurred in connection with such transaction. In Reg. v. Schlesinger, 10 Q. B. 670, the defendant was indicted for perjury growing out of an action before the sheriff's jury in London. The defendant was examined upon the trial of the issues as a witness, and testified in regard to a certain writing that he thought that the words written in red ink on the writing were not his. On appeal it was contended that perjury could not be assigned upon the averment of the defendant that he "thought" the words were not in his handwriting. One of the members of the court said:

"If a witness swears that he thinks a certain fact took place, it may be difficult indeed to show that he committed willful perjury, but it is certainly possible, and the averment is as properly a subject of perjury as any other."

Another member of the court said:

"The objection to the assignment of perjury in the first and second counts seems to me to amount to no more than this,—that, because it is difficult of proof, therefore it is bad. But there would be an easy mode by which witnesses might in many cases escape the consequences of perjury, if using the words 'I think' made them not indictable."

In People v. Robertson, 3 Wheeler, Cr. Cas. 183, it is said:

"In the present case the defendant swears also that he has cause to suspect and does suspect that the wool was stolen by Bishop. The indictment alleges that he had not cause to suspect and did not suspect that the wool was stolen by Bishop. The jury have pronounced the charge in the indictment to be true. Whatever doubts may have once existed, it is now clearly settled that a man may be convicted of perjury in swearing that he believes a fact to be true which he knows to be false."

An expert may be guilty of perjury in swearing to a false opinion. 2 Bish. Cr. Law, § 878; State v. Henderson, 90 Ind. 408. A person who testifies that he believes a certain statement to be true, when he has no probable cause for such belief, is guilty of perjury. State v. Knox, 61 N. C. 312. When a person swears positively to the value of goods of which he knows nothing, although his value is correct, he is guilty of perjury. 3 Greenl. Ev. § 200; People v. McKinney, 3 Parker, Cr. R. 510. "Where a man swears that a thing is so, or that he believes it to be so, when in truth he does not believe it to be so, the oath is false, although the fact really be as stated." State v. Cruikshank, 6 Blackf. 62. An unqualified statement of that which one does not know to be true is equivalent to a statement of that which he knows to be false. Pen. Code, § 101. The facts stated in the indictment of the defendant are sufficient to constitute a crime. Where oral evidence is relied upon to convict a person of perjury, it is necessary to produce at least two witnesses, or one witness supported by corroborating and independent circumstances. This rule arises by reason of the fact that, where oath is placed against oath, it remains doubtful

where the truth lies. It is manifest, however, that this rule does not apply in cases where the proof of the perjury is necessarily based upon circumstantial evidence. It is only necessary in any case to produce evidence sufficient to counterbalance the oath of the defendant, and the legal presumption of his innocence. People v. Stone, 32 Hun, 41. That a person can be convicted of perjury without the production of a witness to testify to the falsity of the evidence of defendant on which the indictment rests is held in U. S. v. Wood, 14 Pet. 430, 10 L. Ed. 527. In that case:

"The defendant was indicted for perjury in falsely taking and swearing 'the owners' oath in cases where goods have been actually purchased,' as prescribed by the fourth section of the supplementary collection law of the 1st of March, 1823. The perjury was charged to have been committed in April, 1837, at the custom house in New York, on the importation of certain woolen goods in the ship Sheridan. The indictment charged the defendant with having intentionally suppressed the true cost of the goods, with intent to defraud the United States. (2) Charging the perjury in swearing to the truth of the invoice produced by him at the time of entry of the goods; the invoice being false, etc. It appeared by the evidence that the goods mentioned in the entry had been bought by the defendant from John Wood, his father, of Saddleworth, England. No witness was produced by the United States to prove that the value or cost of the goods was greater than that for which they were entered at the custom house in New York. The evidence of this offered by the prosecution was the invoice book of John Wood, and thirty-five original letters from the defendant to John Wood, between 1834 and 1837, showing a combination between John Wood and the defendant to defraud the United States by invoicing and entering goods at less than their actual cost; that this combination comprehended the goods imported in the Sheridan; and that the goods received by that ship had been entered by the defendant, he knowing that they had cost more than the prices at which he had entered them. This evidence was objected to on the part of the defendant as not competent proof to convict the defendant of the crime of perjury, and that, if an inference of guilt could be derived from such proof, it was an inference from circumstances not sufficient as the best legal testimony to warrant a conviction. Held that, in order to a conviction, it was not necessary, on the part of the prosecution, to produce a living witness, if the jury should believe from the written testimony that the defendant made a false and corrupt oath when he entered the goods."

It follows, therefore, that whether defendant was guilty or innocent of the crime charged in the indictment was a question of fact for the jury to determine. That the evidence presented a question of fact for determination by the jury seems to have been assumed by the defendant at the trial. The only answer of the defendant to the testimony presented against him was that his mind and memory had become so impaired by disease that he was not legally accountable for his lack of memory in regard to the transactions with Fielding about which he was interrogated. Neither at the close of the evidence offered by the people, nor at the close of the evidence on the trial, did the defendant move for his discharge. The charge to the jury was fair, and, although the questions involved in the issue were fully stated by the court, no exception thereto was taken by the defendant, and no criticism of the charge has been made on the argument in this court. Our examination of the testimony leads us to the conclusion that the verdict should not be set aside, nor a new trial granted, on the facts.

The defendant asserts that the district attorney, in his opening to the trial jury, was erroneously allowed to call their attention to numerous

statements made by the defendant involving independent crimes in which the defendant was a participant. A casual reading of the opening might seem to justify such criticism, but a more careful examination of the whole record convinces us that the evidence referred to by the district attorney was properly received, and that the defendant has had a fair trial. The opening of the district attorney is expressly based upon the defendant's statements and confessions. Everything stated by the district attorney in his opening was shown on the trial as stated by him, by the receipt in evidence of conceded copies of the defendant's testimony before the grand jury, and on former trials of indictments found upon the evidence so given by the defendant. The evidence presented on the trial consisted wholly of defendant's statements, and the circumstances surrounding the same. It is only necessary, therefore, to consider whether any of such statements and confessions are incompetent and harmful. The question at issue on this trial was not whether the defendant had committed the crime of bribery, but was wholly a question of the defendant's memory in regard thereto. It is somewhat analogous to a question of testamentary capacity. Prior to 1896 defendant had never been engaged, at least to any extent, in doing public work; but, according to his sworn statements, in the years 1896 and 1897 he received in the name of others a large number of such contracts, and in connection with each and every of the contracts so received by others in his interest there was an agreement by which he was to pay and did pay Fielding 10 per cent. of the amount of such contracts, and also an agreement by which he was to pay and did pay a large amount to others who were personally connected with the giving of the several contracts, or with the audit and allowance of bills therefor, and payment of the same. The defendant had repeatedly testified in substance that he made these unlawful payments to Fielding in every instance, and also to others on each contract, so that the unlawful payments amounted to 35 or 40 per cent. of the entire amount received by him. If his statements were true, the several contracts were so intimately connected, and so interwoven as to be difficult of separation in fact, and almost impossible of separation in the memory of the person who arranged and carried out the unlawful agreements. His statements are to the effect that he was unable to get any public work, except by making and carrying out such unlawful agreements. His memory in regard to a single contract was necessarily linked to and associated with the entire scheme by which Fielding was in each instance to receive his percentage. The defendant's statements theretofore repeatedly made in court and to public officers in regard to the details of such transactions had a legitimate and immediate bearing upon the strength of the defendant's memory in these intimately associated transactions. All of the defendant's statements referred to by the district attorney in his opening, and offered and received in evidence on the trial, related to these several contracts, and were in the nature of a consecutive history of his transactions with the city works department, and tended to show his mental powers. The time and purpose of these statements, and the severe consequences arising therefrom, emphasize their materiality.

A casual statement may be innocently or thoughtlessly made, but

the defendant's sworn statements made before the grand jury were so made pursuant to an arrangement between himself and others, including his counsel and the district attorney. The statements made by him before the grand jury were therefore so made deliberately, intentionally, and positively, when he knew that the purpose of his examination was to indict those whom he testified were associated with him in crime. These statements were reiterated by him on the various trials, and one of the results of the testimony so given by him was that Fielding, on whose last trial the perjury is claimed to have been committed, was on the first trial convicted and sentenced to imprisonment. Confessedly, the defendant had taken upon himself the unenviable position of an informer, with full knowledge of the probable consequences to his associates, and his statements in connection with such information were properly considered by the jury in determining whether on the last trial of Fielding the testimony given by him was knowingly false and untrue. Prior to Fielding's being granted a new trial there had been a failure to convict some of the others who were indicted on the disclosures made to the grand jury by the defendant. That the defendant sympathized with Fielding was openly stated by him. Notwithstanding defendant had repeated all of the details of the several transactions from time to time under oath, and before the district attorney, and that within three days before the last Fielding trial there was read to him his former testimony, containing every statement which the defendant now claims the court should have excluded, and that he then discussed the same without showing any impairment of memory, he suddenly loses all recollection as to whether the transactions with Fielding ever took place, and testifies that he has no memory as to whether they did or did not take place. The important question on the trial of the indictment for perjury herein was the strength of the defendant's memory. His motive for committing the crime of perjury was also a proper subject of consideration. Apart from the question of defendant's having lost his memory by disease, we do not see how a jury could well have come to any other conclusion than that the defendant was guilty of the crime of perjury, as charged. The case was evidently tried upon the theory that the defendant was irresponsible for his statements, by reason of his being affected by paresis. This was a question of fact, and has been decided against the defendant.

The defendant urges various other grounds of error, none of which, however, we think could possibly have prejudiced his interests on the trial.

The judgment should be affirmed.

PARKER, P. J., and KELLOGG and SMITH, JJ., concur.

FURSMAN, J. (dissenting). One Fielding, who was deputy commissioner of a city department of Brooklyn, was indicted and tried for having knowingly approved a false claim against the city. On the trial the defendant was a witness for the people, and is charged with having then falsely testified that he did not remember having had any conversations with Fielding in reference to matters material to the

issue then being tried. The indictment sets out the alleged false testimony in detail, and negatives the truth of such testimony in every particular. I do not deem it necessary to here point out the charges of the indictment more specifically, because, in my judgment, there were errors committed at the trial which compel a reversal of the conviction, and therefore the question whether the evidence establishes the guilt of the defendant need not be gone into. Every person charged with crime is entitled to a fair trial, and, however guilty he may be, his guilt must be established by proper and competent evidence. Every improper statement of a prosecuting officer, made during the trial, which is calculated to influence or prejudice the minds of the jury against the accused, and each item of incompetent evidence having a tendency to lead them to conclude that he is guilty of the crime charged, because he has committed other offenses, constitute imperative reasons for reversing a conviction, whether upon the whole case the accused appears to be guilty or not. People v. Fielding, 158 N. Y. 553, 53 N. E. 500, 46 L. R. A. 641, 70 Am. St. Rep. 495; People v. Mull, 167 N. Y. 248, 60 N. E. 629. In his opening address to the jury the district attorney was permitted, notwithstanding objections and exceptions, to say many things to the prejudice of the defendant which were not and could not by any possibility be properly proved. It must be borne in mind that on this trial the sole inquiry was whether, in truth and in fact, the defendant did remember certain conversations with Fielding, which he declared on that trial that he did not remember, and to which he had testified before the grand jury which indicted Fielding. The following are examples:

"He [defendant] had to give bribes. He had to give ten per cent. to a man named Milne. He had to pay ten per cent. to Knapp, who was the water purveyor. He had to pay five per cent. to Jensen. All these men could hold up bills unless they got their tribute. He carried out his end of the contract, and they did their end of the work. * * * He had gone before the grand jury, and it had indicted his old friends and confederates, and after that he had gone on the witness stand and been denounced by counsel, and hammered and pounded on so it was burned into his memory so he would not forget it the next day or in a lifetime. What happened? The trials went on, and one man was sent out to the penitentiary. He pleaded guilty." Again: "When the time came to get certain work through in the sewer department he had to see a man named Goff, and Goff demanded fifty dollars a week; and he had to pay Goff and he did pay Goff fifty dollars a week, to overlook the work and let things go through." Again: "In the investigation, when the various warrants turned up, this condition appeared: Thomas Fraser & Co. seemed to be the repositary of nearly all the warrants that came directly to Doody. Whether it will become necessary to show you this, I don't know. But it will be revealed by Doody's testimony that the warrants were signed Thomas Fraser & Co. * * * The question is, how far is the jury to be deceived, if he has attempted to deceive? Now, gentlemen of the jury, it will show to some extent the character of this man's mind if you will follow it out. Why did he create Thomas Fraser & Co.? Why not take the warrants himself? All the warrants given to Finkle, Heyward, and Cozzens all went to him. He will tell you that he got every cent of the $200,000, except the thirty-five per cent. he had to pay out under his agreement. Every dollar of it came to himself. Why run it down into this rat hole,—Thomas Fraser & Co.? Who was Thomas Fraser? In his testimony he attempts to say that Thomas Fraser is a brother of some banker in New York. He is asked: 'Did Thomas Fraser get any part of this? No, sir. Was the senior member of this firm anything to you? Yes,

sir; a partner. Did he get any part of this? He, perhaps, did get two hundred dollars.' It means that is a cover. Every warrant, when they came down to Fraser & Co., they will be up against a stone wall. Who is Tom Fraser & Co? He can't be found." Again: "Contracts made and money expended without any authority in law. What is the cause of it? They sent over to the district attorney's office for an investigation, and the investigation proceeds to a certain stage, and immediately we are up against a stone wall. Who is Fraser & Co.? Who is Cozzens? Who is Finkle? And who is Heyward? But a little probing soon revealed in all this filth and rubbish this man Doody. What was to be done? It was soon discovered he was the real criminal. He was the hub, and without him the spokes of the wagon could not remain on. We sent for his son, as his name appeared on some of the vouchers. It will appear by his father's testimony that the son came before the grand jury, and he refused to answer. I show motive for the responsibility he was assuming, to show that, under that pressure of his son before the grand jury, he came before the grand jury himself. His son came before the grand jury, as Doody will tell you. The son refused to answer any questions, and was brought into court with the grand jury, and told to answer the questions, and sent back. An adjournment was had, and an arrangement was made whereby Doody was to tell his story of his criminality, and all his connection with the frauds, and the connection of everybody else. * * * He had purchased his safety at the expense of his old friends and confederates. He turned informer upon them, and thus saved himself from punishment for these crimes. Again: "That was his position in March, 1898, and on his testimony these indictments were all secured against these people. A short while after that, Milne, who had been his friend, came into court and pleaded guilty. He was the young inspector out on the works, to whom he had paid one hundred dollars. Milne pleaded guilty, and was sent to the penitentiary."

These remarks, and others which I have not quoted, were highly improper, and well calculated to excite prejudice and harmful bias against the defendant in the minds of the jury. They were unrebuked by the court, and objections to them were overruled. The jury must have supposed that they were approved by the presiding justice especially as wholly incompetent evidence was afterwards admitted, against objection and exception, in proof of these statements. Statements of this character by the public prosecutor in criminal cases have been repeatedly condemned by appellate courts, and new trials granted because of them. People v. Smith, 162 N. Y. 520, 56 N. E. 1001; People v. Mull, 167 N. Y. 247, 60 N. E. 629; People v. Fielding, 158 N. Y. 542, 53 N. E. 497, 46 L. R. A. 641, 70 Am. St. Rep. 495. See page 547, 158 N. Y., and page 498, 53 N. E., 46 L. R. A. 641, 70 Am. St. Rep. 495, and cases cited; People v. Milks, 55 App. Div. 372, 66 N. Y. Supp. 889.

The only crime charged in the indictment being perjury alleged to have been committed in falsely testifying that he did not remember certain conversations with Fielding, the prosecution was allowed to prove, by reading from the testimony of the defendant before the grand jury, a number of other distinct and separate crimes, having no connection whatever with that under investigation. Among these are the following: That he paid one Phillips money to induce the commissioner of city works to aid him in defrauding the city; that he entered into corrupt agreement with one Willis, commissioner of city works, to defraud the city; that such agreement had been carried out, and the city actually defrauded of large sums; that he entered into a corrupt agreement with one Knapp, who was water purveyor

of the city, by which the city of Brooklyn was defrauded; that he had bribed the commissioner of city works to allow him to defraud the city; that he paid one Milne, who was an inspector of the department of city works, the sum of $100 on each warrant he received in payment for the work done by him for the city of Brooklyn, for certifying that the work was done properly, although such work was not examined by Milne; that he entered into a corrupt agreement to pay and did pay one Jensen, who was a clerk in the comptroller's office, $200 on each of these warrants, to induce said Jensen to mark the same "Correct"; that he entered into another corrupt agreement with Jensen by which he was to pay and did pay to Jensen 5 per cent. on all bills rendered against the city of Brooklyn; that he paid to one Goff, who was superintendent of sewers in the department of city works, a bribe of $50 each week; that he paid various inspectors of the city works department from $5 to $10 at regular intervals, as bribes; that he paid one Clark, who was president of the board of aldermen, the sum of $500, as a bribe; that he made a corrupt agreement with one Leaycraft to bribe the aldermen of the city of Brooklyn to pass his bills for cleaning snow from the streets.

Assuming that this evidence was pertinent to some inquiry then pending before the grand jury, it was clearly incompetent on this trial, and necessarily harmful to the defendant, by holding him up to the jury as one habitually guilty of defrauding the city of Brooklyn, and bribing its officials. Assuming, again, that the testimony of defendant before the grand jury as to his conversations with Fielding was competent upon this trial upon the question whether he did or did not remember them upon Fielding's trial, the evidence should have been limited to that. His statements before that body concerning his connection with other crimes were inadmissible for any proper purpose. This evidence did not tend to prove a motive for committing the alleged perjury, nor the intent of defendant in committing it, nor identity; nor did it tend to prove that the perjury was not accidental, nor that the several distinct offenses thereby proved were part of a scheme of which the perjury was also a part. In order to render proof of other crimes competent, it must fall within one of these requisites. People v. Molineux, 168 N. Y. 264, 61 N. E. 286. It was not rendered competent by showing it to have been testified to by defendant himself before the grand jury. It was simply proof of other and independent crimes, and does not differ, in respect to admissibility, from evidence of such crimes derived from other sources. To emphasize this evidence, indictments against these various parties were put in evidence, and proof was allowed, against defendant's objection and exception, that one of the persons indicted (Milne) had pleaded guilty, and had thereupon been sent to the penitentiary. This, also, was error. The inquiry was whether the testimony of the defendant on the Fielding trial that he did not remember certain conversations with Fielding was false. The indictment against Milne was for conniving at the audit and allowance of a fraudulent claim against the city. What that claim was, does not appear. Neither Milne's admission of guilt, nor the character of his punishment, were pertinent to the question of defendant's perjury. Taken in connection

with the evidence of this defendant before the grand jury as to his transactions with Milne, above alluded to, it was thus made to appear that the defendant was guilty of the crime of bribing Milne, and that Milne had confessed it. The necessary effect of all of this evidence was to incite in the minds of the jury a belief that the defendant was habitually criminal in all his dealings with the officials of Brooklyn, and thereby the more easily to persuade them that he was guilty of the perjury with which he was charged. There is no conceivable connection between these facts, and the evidence was clearly inadmissible. People v. McQuade, 110 N. Y. 285, 18 N. E. 156, 1 L. R. A. 273 (see page 306, 110 N. Y., and page 165, 18 N. E., 1 L. R. A. 273); People v. Sharp, 107 N. Y. 466, 14 N. E. 343, 1 Am. St. Rep. 851.

The admission in evidence of the several indictments against Willis and Phillips for conspiracy, against Willis for bribery, against Knapp for conniving at the audit of a fraudulent claim, against Milne for the same offense, against Clark and Leaycraft severally for accepting money to influence their acts as aldermen, and against Goff and Jensen for accepting bribes, was improper. An indictment is a mere accusation. It neither proves nor tends to prove anything, even against the defendant named in it. Even a witness cannot properly be asked whether he has been indicted, because an indictment furnishes no proof of guilt, and to permit an affirmative answer might improperly influence the jury against his credibility. Kober v. Miller, 38 Hun, 184, and cases cited. These indictments bore no relation to any question involved in this trial. It was made to appear that they were found upon the evidence of the defendant above referred to, and which connected him with each of the offenses named in them. It is obvious that this evidence could have had no other effect than to improperly influence the minds of the jury against the defendant.

It was error, also, to permit to be read in evidence the remark of the presiding justice on the first trial of Fielding concerning this defendant, to the effect that he was an unwilling witness. The opinion of the judge, thus proved, that the defendant was reluctant to tell the truth on that trial, may well have influenced the jury to believe that he testified falsely on the second trial. People v. Hill, 37 App. Div. 327, 56 N. Y. Supp. 282; People v. Brow, 90 Hun, 509, 35 N. Y. Supp. 1009; People v. Corey, 157 N. Y. 332, 51 N. E. 1024.

Other errors are alleged, which it is unnecessary now to consider, inasmuch as those already mentioned require a reversal of the conviction.